## UNITED STATES *v.* UNION PACIFIC RAILROAD CO.

No. 97.   Argued January 23, 1957.—Decided April 8, 1957.

*Solicitor General Rankin* argued the cause for the United States. With him on the brief were *Assistant Attorney General Morton, Roger P. Marquis* and *Fred W. Smith.*

*William W. Clary* argued the cause for respondent. With him on the brief were *Louis W. Myers, Warren M. Christopher, John U. Loomis, W. R. Rouse* and *J. H. Anderson.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is an action brought in the District Court by the United States to enjoin the Union Pacific Railroad Company from drilling for oil and gas on "the right of way" granted it by § 2 of the Act of July 1, 1862, 12 Stat. 489, 491, for the construction of a railroad and telegraph line. The claim of the United States is that "the right of way" granted by the Act is not a grant that includes mineral rights. The District Court's decision was adverse to the United States. 126 F. Supp. 646. The Court of Appeals affirmed. 230 F. 2d 690. The case is here on a petition for a writ of certiorari which we granted in view of the public importance of the question presented. 352 U. S. 818.

The "right of way" which was granted by § 2 of the Act was "for the construction of said railroad and telegraph line." As an aid to the construction of the railroad, "every alternate section of public land" on each side of the road was also granted. § 3. Section 3 further provided "That

all mineral lands shall be excepted from the operation *of this act . . . .*" (Italics added.)

On the face of the Act it would seem that the use of the words "the right of way" describes a lesser interest than the grant of "public land." Moreover, this right of way was granted Union Pacific "for the construction of said railroad and telegraph line." § 2. That purpose is not fulfilled when the right of way is used for other purposes. See *Northern Pacific R. Co.* v. *Townsend,* 190 U. S. 267, 271. It would seem that, whatever may be the nature of Union Pacific's interest in the right of way, drilling for oil on or under it is not a railroad purpose within the meaning of § 2 of the Act.[1]

It would also seem from the words of the Act that, whatever rights may have been included in "the right of way," mineral rights were excepted by reason of the proviso in § 3 excepting "mineral lands." The exception of "mineral lands," as applied to the right of way, may have been an inept way of reserving mineral rights. The right of way certainly could not be expected to take all the detours that might be necessary were it to avoid all lands containing minerals. But that the proviso applies to § 2 as well as to § 3 is plain. While the grant of "the right of way" is made by § 2 and the exception of "mineral lands" is contained in § 3, the exception extends not merely to § 3 but to the entire Act.

---

[1] To that effect are administrative decisions, by officers of the Interior Department dealing with comparable statutes, that a congressional grant of land "for railroad purposes" does not carry the right to drill for oil or to remove solid minerals. *Missouri, Kansas & Texas R. Co.,* 33 L. D. 470 (Act of July 26, 1866, 14 Stat. 289); *Missouri, Kansas & Texas R. Co.,* 34 L. D. 504 (Act of February 28, 1902, 32 Stat. 43); *Use of Railroad Right of Way for Extracting Oil,* 56 I. D. 206 (Act of March 3, 1875, 18 Stat. 482); *Northern Pacific R. Co.,* 58 I. D. 160 (Act of July 2, 1864, 13 Stat. 365).

It is said that the exception in § 3 was in terms made applicable to the entire Act merely to leave no doubt that land grants to other railroads, contained in §§ 9, 13 and 14 of the Act, were not to include "mineral lands." But the exception in § 3 is not limited merely to a few enumerated sections any more than it is limited to § 3. The proviso makes sense if it is read to reserve all mineral rights under the right of way, as well as to reserve mineral lands in the alternate sections of public land granted in aid of the construction of the road. Indeed, we can see no other way to construe it if it is to apply, as it does, not merely to § 3, but to the entire Act, including § 2 which grants the right of way.

The reservation of the mineral resources of these public lands for the United States was in keeping with the policy of the times. The gold strike in California in 1848 made the entire country conscious of the potential riches underlying the western part of the public domain. The method of asserting federal control over mineral lands was not finally settled until the Act of July 26, 1866, 14 Stat. 251, prescribed the procedure by which mineral lands could be acquired. But meanwhile—from 1849 to 1866—the federal policy was clear. As the Court said in *Mining Co.* v. *Consolidated Mining Co.*, 102 U. S. 167, the federal policy during this interim period was to reserve mineral lands, not to grant them. The policy was found to be so "uniform" in this interim period (*id.*, at 175) that the Court, in construing an 1853 Act governing public lands in California, held that a grant to California did not include mineral lands, although they were not specifically excepted.

The case is much stronger here, for "mineral lands" are specifically reserved. It is, therefore, wholly in keeping with the federal policy that prevailed in 1862, when the present right of way was granted, to construe "mineral

lands" to include mineral resources under the right of way. For it was the mineral riches in the public domain that Congress sedulously sought to preserve until it formulated the special procedure by which all mineral resources were to be administered. In *United States v. Sweet*, 245 U. S. 563, Mr. Justice Van Devanter, our foremost expert on public land law, discussed this policy at length and cited in support of this federal policy the very Act we have under consideration in the present case. *Id.*, p. 569, n. 1. And see *Barden v. Northern Pacific R. Co.*, 154 U. S. 288, 317–318. We would have to forget history and read legislation with a jaundiced eye to hold that when Congress granted only a right of way and reserved all "mineral lands" it nonetheless endowed the railroad with the untold riches underlying the right of way. Such a construction would run counter to the established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it. *Caldwell v. United States*, 250 U. S. 14, 20–21. These are the reasons we construe "mineral lands" as used in § 3 of the Act to include mineral rights in the right of way granted by § 2.

The system which Congress set up to effectuate its policy of reserving mineral resources in the alternate sections of public land granted by § 3 was by way of an administrative determination, prior to issuance of a patent, of the mineral or nonmineral character of the lands. Patents were not issued to land administratively determined to constitute mineral lands. And, the administrative determination was final. *Burke v. Southern Pacific R. Co.*, 234 U. S. 669. Such an administrative system was obviously inappropriate to the right of way granted by § 2. The land needed for the right of way was

not acquired through the issuance of a patent, but by the filing of a map showing the definite location of the road, followed by its actual construction. *Northern Pacific R. Co.* v. *Townsend, supra,* at 270.

A provision for prior administrative determination of which land in the path of the right of way constituted mineral lands would have been inappropriate for another reason. As already noted, the route of the railroad had to be determined by engineering considerations which could not allow for the extensive detours that the avoidance of land containing minerals would make necessary.

Because the administrative system, by which the exception of "mineral lands" was administered in relation to the lands granted by § 3, is inappropriate to the right of way granted by § 2, we are urged to conclude that the exception of "mineral lands" in § 3 was not intended to apply to § 2. But, construing the grant in § 2 favorably to the Government, as we must, we cannot conclude that Congress meant the policy it expressed, by excepting "mineral lands" in § 3, to be inapplicable to § 2 in the face of its admonition that the exception is applicable to the entire Act. Nor can we conclude that, because the administrative system, by which mineral resources in the grant of land under § 3 were reserved, was inappropriate to § 2, Congress did not intend appropriate measures to reserve minerals under the right of way granted by § 2. We cannot assume that the Thirty-seventh Congress was profligate in the face of its express purpose to reserve mineral lands.

To be sure, Congress later on designed a more precise and articulated system for the separation of subsoil rights from the other rights in the western lands. See, for example, the Act of March 3, 1909, 35 Stat. 844. It would have been better draftsmanship, if, in referring to § 2, Congress had used the words "mineral rights" instead of

"mineral lands." Yet it will not do for us to tell the Congress "We see what you were driving at but you did not use choice words to describe your purpose."

Some reliance is placed on a line of decisions of the Court which describe the rights of way under early railroad land grants as limited fees. These cases were, for the most part, controversies between the railroad and third persons and involved problems so remote from the present one as to be inapt as citations. For example, the leading case raised the question whether third parties could establish valid homesteads on the railroad right of way after the right of way had been located and the tracks laid. *Northern Pacific R. Co.* v. *Townsend, supra.* An answer in favor of the railroad on the ground that it had a limited fee could hardly be an adjudication concerning the ownership of mineral resources underlying the right of way in a contest between the United States and the railroad. In only one of the cases cited was the United States a party; and in that case the question did not involve mineral rights but jurisdiction over a person transporting liquor. If the right of way was Indian Country when it crossed an Indian reservation, then a violation of the liquor laws had occurred. The Court held that the right of way was not Indian Country and said in passing that the right of way constituted the fee in the land. *Clairmont* v. *United States*, 225 U. S. 551, 556. We do not stop to examine the other cases [2] using

---

[2] *Railroad Co.* v. *Baldwin*, 103 U. S. 426 (a contest between the owner of the right of way and a settler who took possession before the line was definitely located); *Missouri, K. & T. R. Co.* v. *Roberts*, 152 U. S. 114 (a contest between the owner of the right of way and one who claimed the land under a grant from the State); *New Mexico* v. *United States Trust Co.*, 172 U. S. 171 (an effort by the State to tax the right of way and structures on it in face of an exemption granted by Congress); *Union Pac. R. Co.* v. *Laramie Stock Yards Co.*, 231 U. S. 190 (whether the grant of the right of way was qualified by

like language to describe the railroad's right of way, because in none of them was there a contest between the United States and the railroad-grantee over any mineral rights underlying the right of way. The most that the "limited fee" cases decided was that the railroads received all surface rights to the right of way and all rights incident to a use for railroad purposes.

Great reliance is placed on *Great Northern R. Co.* v. *United States,* 315 U. S. 262, for the view that the grant of a right of way in the year 1862 was the grant of a fee interest. In that case we noted that a great shift in congressional policy occurred in 1871: that after that period only an easement for railroad purposes was granted, while prior thereto a right of way with alternate sections of public land along the right of way had been granted. In the latter connection we said, "When Congress made outright grants to a railroad of alternate sections of public lands along the right of way, there is little reason to suppose that it intended to give only an easement in the right of way granted in the same act." *Id.,* at 278. But we had no occasion to consider in the *Great Northern* case the grant of a right of way with the reservation of "mineral lands." The suggestion that a right of way may at times be more than an easement was made in an effort to distinguish the earlier "limited fee" cases. To complete the distinction, Mr. Justice Murphy with his usual discernment added, "None of the cases involved the problem of rights to subsurface oil and minerals." *Id.,* at 278.

a later Act of Congress); *Rio Grande W. R. Co.* v. *Stringham,* 239 U. S. 44 (a contest between the owner of the right of way and the owner of a placer patent); *Choctaw, O. & G. R. Co.* v. *Mackey,* 256 U. S. 531 (an effort of the owner of the right of way to get an exemption from local taxation for a street improvement that enhanced the value of the railroad use); *Missouri, K. & T. R. Co.* v. *Oklahoma,* 271 U. S. 303 (the right of the owner of the right of way to compensation for damage suffered by the construction of crossings).

The latter statement goes to the heart of the matter. There are no precedents which give the mineral rights to the owner of the right of way as against the United States. We would make a violent break with history if we construed the Act of 1862 to give such a bounty. We would, indeed, violate the language of the Act itself. To repeat, we cannot read "mineral lands" in § 3 as inapplicable to the right of way granted by § 2 and still be faithful to the standard which governs the construction of a statute that grants a part of the public domain to private interests.

*Reversed.*

MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON and MR. JUSTICE HARLAN join, dissenting.

This is a suit by the United States to restrain respondent railroad company from removing oil and gas from the land forming respondent's right of way and to quiet title to those mineral deposits in the United States. The controversy arises out of the Act of July 1, 1862, 12 Stat. 489, the purpose of which is described by its title "An Act to aid in the Construction of a Railroad and Telegraph Line from the Missouri River to the Pacific Ocean, and to secure to the Government the Use of the same for Postal, Military, and Other Purposes." The Government claimed that § 2 of that Act, in granting respondent's predecessor in title "the right of way through the public lands" for the construction of a railroad, did not vest the railroad with any interest in the underlying minerals. The District Court for the District of Wyoming granted judgment for respondent. It held that the Act of 1862 "granted to Union Pacific a fee simple determinable, sometimes called a base, qualified or limited fee,

of the lands contained within the right of way, subject only to an implied condition of reverter in the event that Union Pacific ceases to use the right of way," and that this gave Union Pacific sole right to the underlying minerals, which had not been reserved by the United States. 126 F. Supp. 646. The Court of Appeals for the Tenth Circuit affirmed this judgment. 230 F. 2d 690.

Section 2 of the Act of 1862 provides:

> "*And be it further enacted,* That the right of way through the public lands be, and the same is hereby, granted to said company for the construction of said railroad and telegraph line; and the right, power, and authority is hereby given to said company to take from the public lands adjacent to the line of said road, earth, stone, timber, and other materials for the construction thereof; said right of way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass over the public lands, including all necessary grounds for stations, buildings, workshops, and depots, machine shops, switches, side tracks, turntables, and water stations. The United States shall extinguish as rapidly as may be the Indian titles to all lands falling under the operation of this act and required for the said right of way and grants hereinafter made."

As additional aid toward construction of the line, § 3 granted the railroad five alternate sections of public land per mile on each side of the road, with the qualification that "all mineral lands shall be excepted from the operation of this act." And §§ 5 and 11 provided for the issuance to the company, upon its completion of a prescribed number of miles of track, of United States bonds of an aggregate value of not less than $16,000 nor more than $48,000 per mile, depending on the difficulty of the ter-

rain. Two years later, Congress amended the Act to double the number of alternate sections of land granted in aid of construction, 13 Stat. 356.

This Act of 1862 was one of a series of statutes providing assistance to individually named railroads to promote their construction. The Act of July 2, 1864, 13 Stat. 365, gave an even greater amount of land to the Northern Pacific Railroad Company, and in 1866 other Acts were passed for the benefit of the St. Joseph and Denver City Railroad Company, 14 Stat. 210; the Kansas and Neosho Valley Railroad Company, 14 Stat. 236; the California and Oregon Railroad Company, 14 Stat. 239; the southern branch of the Union Pacific Company, 14 Stat. 289; and the Atlantic and Pacific Railroad Company, 14 Stat. 292. Each of these statutes contained a grant substantially identical with that made by § 2 of the Act of 1862, the object of our immediate concern.

Section 2 was, on the face of it, a specific grant contained in a specific statute designed to achieve a specific, contemporaneous goal—construction of a railroad. Unlike constitutional provisions such as the Due Process Clause or enactments such as the Sherman Law that embody a felt rather than defined purpose and necessarily look to the future for the unfolding of their content, making of their judicial application an evolutionary process nourished by relevant changing circumstances, a specific grant like § 2 does not gain meaning from time. Its scope today is what it was in 1862, and the judicial task is to ascertain what content was conveyed by that section in 1862. Did the Thirty-seventh Congress grant the entire present interest, the fee, in the land forming the right of way, or did it convey merely a right of passage, an easement, retaining for the United States all other rights in the land, including the right to its minerals?

In a line of decisions going back to *Railroad Co. v. Baldwin,* 103 U. S. 426, this Court has consistently recog-

nized that the Act of 1862 and its companion Acts gave to the railroads the entire present interest in the public lands allocated to them for a right of way. In the *Baldwin* case, the Court dealt with the grant of the right of way to the St. Joseph & Denver Railroad under one of the 1866 statutes, 14 Stat. 210. It stated that

> ". . . the grant of the right of way . . . contains no reservations or exceptions. It is a present absolute grant, subject to no conditions except those necessarily implied, such as that the road shall be constructed and used for the purposes designed. Nor is there anything in the policy of the government with respect to the public lands which would call for any qualification of the terms." *Id.,* at 429–430.

A similar grant of the right of way, in an 1866 grant to the southern branch of the Union Pacific Company, 14 Stat. 289, was repeatedly characterized in *Missouri, K. & T. R. Co.* v. *Roberts,* 152 U. S. 114, as being "absolute in terms, covering both the fee and possession." *Id.,* at 117. In *New Mexico* v. *United States Trust Co.,* 172 U. S. 171, 181–182, the Court acknowledged that the term "right of way" had two distinct meanings: (1) a "mere right of passage"; and (2) " '*that strip* of land which railroad companies take upon which to construct their roadbed.' That is, the land itself—not a right of passage over it." The Court held that the right of way granted to the Atlantic & Pacific Railroad by another of the 1866 Acts, 14 Stat. 292, was of the latter class, relying on the *Roberts* case.

*Northern Pacific R. Co.* v. *Townsend,* 190 U. S. 267, made even more plain the Court's view that when Congress in the 1860's granted a railroad right of way it conveyed the entire present interest in the strip of land. This was a suit by the railroad against one whose predecessors in title had, after the road was constructed, begun

adverse possession of part of the right of way and had subsequently obtained homestead patents to the section of land over which the road passed. Mr. Justice White began the Court's opinion by stating:

> "At the outset, we premise that, as the grant of the right of way, the filing of the map of definite location, and the construction of the railroad within the quarter section in question preceded the filing of the homestead entries on such section, the land forming the right of way therein was taken out of the category of public lands subject to preëmption and sale, and the land department was therefore without authority to convey rights therein. It follows that the homesteaders acquired no interest in the land within the right of way because of the fact that the grant to them was of the full legal subdivisions." *Id.,* at 270.

The Court then went on to hold that the right of way granted by the Act of 1864 gave the railroad "a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted" and that to allow private parties to acquire part of this land by adverse possession would defeat Congress' plainly manifested desire that the entire right of way continue to be the grantee's so long as the railroad was maintained.

All later opinions of the Court concerning the railroad statutes of the '60's express an undeviating adherence to the scope given to this grant as announced by the *Baldwin* case, *supra,* in 1881. *E. g., Northern Pacific R. Co.* v. *Ely,* 197 U. S. 1, 6; *Clairmont* v. *United States,* 225 U. S. 551, 556; *Union Pacific R. Co.* v. *Laramie Stock Yards Co.,* 231 U. S. 190, 198; *Missouri, K. & T. R. Co.* v. *Oklahoma,* 271 U. S. 303, 308.

This consistent course of construction is bound to give the impression that Congress was rather free-handed in its disposition of the public domain ninety years and more ago. And so it was. We said in *Great Northern R. Co.* v. *United States,* 315 U. S. 262, 273:

> "Beginning in 1850, Congress embarked on a policy of subsidizing railroad construction by lavish grants from the public domain. Typical were the Illinois Central Grant, Act of September 20, 1850, c. 61, 9 Stat. 466; Union Pacific Grant of July 1, 1862, c. 120, 12 Stat. 489; Amended Union Pacific Grant, Act of July 2, 1864, c. 216, 13 Stat. 356; and Northern Pacific Grant, Act of July 2, 1864, c. 217, 13 Stat. 365. This last grant was the largest, involving an estimated 40,000,000 acres. In view of this lavish policy of grants from the public domain it is not surprising that the rights of way conveyed in such land-grant acts have been held to be limited fees. *Northern Pacific Ry. Co.* v. *Townsend,* 190 U. S. 267. Cf. *Missouri, K. & T. Ry. Co.* v. *Roberts,* 152 U. S. 114." [1]

During this period "there passed into the hands of western railroad promoters and builders a total of 158,293,000 acres, an area almost equaling that of the New England states, New York and Pennsylvania combined." "Land Grants," 9 Encyclopedia of the Social Sciences (1935) 32, 35. The powerful Thaddeus Stevens, himself the proponent of the Northern Pacific bill, spoke with authoritative truthfulness when he said of the House Committee that approved it: "the committee was willing to give to the company almost any amount [of land] that it thought it could make use of . . . ." in order to induce

---

[1] The last three sentences quoted were a footnote to the first sentence.

construction of the railroad. Cong. Globe, 38th Cong., 1st Sess. 1698.[2]

This "lavish" congressional policy brought results, for in 1869 the much desired transcontinental route was completed. With realization of the goal, however, the mood

---

[2] When striving to understand the basis for this bountiful congressional policy, it is helpful to recall what this Court said in *United States* v. *Union Pacific R. Co.*, 91 U. S. 72, 79–80:

"Many of the provisions in the original act of 1862 are outside of the usual course of legislative action concerning grants to railroads, and cannot be properly construed without reference to the circumstances which existed when it was passed. The war of the rebellion was in progress; and, owing to complications with England, the country had become alarmed for the safety of our Pacific possessions. . . . It is true, the threatened danger was happily averted; but wisdom pointed out the necessity of making suitable provision for the future. This could be done in no better way than by the construction of a railroad across the continent. Such a road would bind together the widely separated parts of our common country, and furnish a cheap and expeditious mode for the transportation of troops and supplies. . . .

". . . Although this road was a military necessity, there were other reasons active at the time in producing an opinion for its completion besides the protection of an exposed frontier. There was a vast unpeopled territory lying between the Missouri and Sacramento Rivers which was practically worthless without the facilities afforded by a railroad for the transportation of persons and property. With its construction, the agricultural and mineral resources of this territory could be developed, settlements made where settlements were possible, and thereby the wealth and power of the United States largely increased; and there was also the pressing want, in time of peace even, of an improved and cheaper method for the transportation of the mails, and of supplies for the army and the Indians.

"It was in the presence of these facts that Congress undertook to deal with the subject of this railroad. The difficulties in the way of building it were great, and by many intelligent persons considered insurmountable."

These compelling considerations led Congress to offer the Union Pacific Company what Mr. Chief Justice Waite called "extraordinary inducements." *Sinking-Fund Cases*, 99 U. S. 700, 723.

of uncritical enthusiasm toward railroad enterprises began to veer. The Court summarized the consequences of this shift in popular feeling in the *Great Northern* case:

"This policy [of "lavish grants from the public domain"] incurred great public disfavor, which was crystallized in the following resolution adopted by the House of Representatives on March 11, 1872:

" '*Resolved,* That in the judgment of this House the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued, and that every consideration of public policy and equal justice to the whole people requires that the public lands should be held for the purpose of securing homesteads to actual settlers, and for educational purposes, as may be provided by law.' Cong. Globe, 42d Cong., 2d Sess., 1585 (1872). After 1871 outright grants of public lands to private railroad companies seem to have been discontinued. But, to encourage development of the Western vastnesses, Congress had to grant rights to lay track across the public domain, rights which could not be secured against the sovereign by eminent domain proceedings or adverse user. For a time special acts were passed granting to designated railroads simply 'the right of way' through the public lands of the United States. That those acts were not intended to convey any land is inferable from remarks in Congress by those sponsoring the measures. . . .

"The burden of this special legislation moved Congress to adopt the general right of way statute now before this Court. . . ." 315 U. S., at 273–275 (footnotes omitted).

The General Right of Way Statute of 1875, 18 Stat. 482, was significantly different from the Act of 1862 and its companions. It granted the railroads neither alter-

nate sections of public land nor direct financial subsidy. The right of way provided for was half the width of that given by the 1862 and 1864 laws. And § 2 of the Act stated that any railroad whose right of way ran through a canyon, pass or defile "shall not prevent any other railroad company from the use and occupancy of the said canyon, pass, or defile, for the purposes of its road, in common with the road first located . . . ." Moreover, § 4 required the recipient of each right of way to note its location on the plats in the local land office, and provided that "thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way . . . ."

Detailed study of the history of federal right of way legislation led us to conclude in the *Great Northern* case that a right of way granted by the 1875 Act was an easement and not a limited fee.[3] From this it followed that the railroad had no right to the underlying minerals. Basic to the Court's characterization of the right of way as an easement was the recognition that "Since it [the General Right of Way Statute] was a product of the sharp change in Congressional policy with respect to railroad grants after 1871, it is improbable that Congress intended by it to grant more than a right of passage, let alone mineral riches." *Id.*, at 275. The change in congressional policy was found to be reflected in the language of the statute, which strongly suggested the grant of a right of use and occupancy only. Especially persuasive was the provision of § 4 that "lands over which such right of way

---

[3] The *Great Northern* decision departed from the Court's earlier construction of the General Right of Way Statute in *Rio Grande Western R. Co.* v. *Stringham,* 239 U. S. 44. The *Stringham* case, written by Mr. Justice Van Devanter, held, on the basis of the cases dealing with pre-1871 legislation, that right of way granted by the 1875 Act "is . . . a limited fee, . . . and carries with it the incidents and remedies usually attending the fee." *Id.*, at 47.

shall pass shall be disposed of subject to such right of way." *Id.*, at 271, 278. Legislative history and substantially contemporaneous administrative construction confirmed this view.[4] These strong differentiating factors led the Court to conclude that the line of cases interpreting the lavish pre-1871 grants was not controlling. But no doubt was cast upon the scope to be attributed to those decisions with respect to the Act of 1862 and its associated measures: "When Congress made outright grants to a railroad of alternate sections of public lands along the right of way, there is little reason to suppose that it intended to give only an easement in the right of way granted in the same act. And, in none of those acts

---

[4] In explaining why the House Public Lands Committee had inserted a clause similar to § 4 of the 1875 Act in a special right of way bill considered in 1872, Congressman Slater stated:

"The point is simply this: the land over which this right of way passes is to be sold subject to the right of way. It simply provides that this right of way shall be an incumbrance upon the land for one hundred feet upon each side of the line of the road; that those who may afterward make locations for settlement shall not interfere with this right of way.

"Mr. Speer, of Pennsylvania. It grants no land to any railroad company?

"Mr. Slater. No, sir." Cong. Globe, 42d Cong., 2d Sess. 2137. And in the House debate on the 1875 Act itself, Congressman Hawley said:

"It simply and only gives the right of way. It merely grants to such railroad companies as may be chartered the right to lay their tracks and run their trains over the public lands; it does nothing more." 3 Cong. Rec. 407.

The earliest administrative construction of the 1875 Act plainly stated that the railroad received an easement rather than a fee. The Land Department Circular of January 13, 1888, said:

"The act of March, 3, 1875, [*sic*] is not in the nature of a grant of lands; it does not convey an estate in fee, either in the 'right of way' or the grounds selected for depot purposes. It is a right of use only, the title still remaining in the United States." 12 L. D. 423, 428.

was there any provision comparable to that of § 4 of the 1875 Act . . . ." *Id.,* at 278.

The significance of the imposing body of opinions culminating in the *Townsend* case is not diminished if one acknowledges, as was done in *Great Northern,* that they did not explicitly decide the rights to minerals. As we have seen, in case after case this Court determined the railroad's interest in the right of way granted by the pre-1871 laws to be a limited fee. This term has a settled meaning—it denotes present ownership of the entire interest in land, an ownership that will continue so long as a stated contingency, leading to a reverter, does not occur. The Court's repeated use of this highly technical term was not inadvertent. In the *United States Trust Co.* case, for example, in reply to the contention that the *Roberts* case was not controlling because the distinction between an easement and a fee had not been presented there, the Court said:

> ". . . The difference between an easement and the fee would not have escaped his [Mr. Justice Field's] attention and that of the whole court, with the inevitable result of committing it to the consequences which might depend upon such difference." 172 U. S., at 182.

The Court then went on to hold that one of the consequences of the railroad's fee interest in the right of way, *i. e.,* its ownership of "the land itself," was exemption from state taxation of improvements erected thereon. Another of those consequences, of course, is ownership of the minerals underlying the right of way. Certainly this was acknowledged in *Townsend* when the Court held that the land forming the right of way was no longer public land and that, consequently, the Land Department was "without authority to convey rights therein" and those claiming under government patents "acquired no interest

in the land within the right of way." See *supra,* p. 124. If mineral rights had not been included in the fee, the patents issued by the United States would have conveyed those rights. The legal consequence that mineral rights are embraced in a grant that conveys a limited fee governed the judgment of two federal courts that were called upon to construe a similar grant made to the Illinois Central by the Act of 1850. *United States* v. *Illinois Central R. Co.,* 89 F. Supp. 17; affirmed, 187 F. 2d 374.[5] To argue that the "limited fee" that the long, unbroken line of cases found in the right of way grant in these enactments of the '60's granted a fee merely in the surface is to palter with language and with our decisions. "Surface" could not, of course, mean merely the area that is seen by the eye. To say that it means the visual area and an indeterminate depth—x inches or x feet—necessary for support is to ask the Court to rewrite legislation and to cast upon it administrative tasks in order to accomplish a policy that seems desirable a hundred years after Congress acted on a different outlook. No wonder that this Court did not accept such an inadmissible retrospective reading of a statute when the Government pressed it on us in the *Great Northern* case. See Argument for the United States, 315 U. S., at 269.

The *Townsend* case also serves to refute the suggestion that the railroad in its use of the right of way is confined to what in 1957 is narrowly conceived to be "a railroad purpose." *Townsend* flatly reaffirmed what its predecessors stated—that the grant should be construed "as though the land had been conveyed in terms to have and to hold the same so long as it was used for the railroad

---

[5] Apparently this has always been respondent's understanding of the right of way grant, for the District Court found that "It has long been the practice of the defendant when entering into leases of portions of its right of way to reserve the right to retake possession for mineral operations."

right of way." 190 U. S., at 271. The Court recognized that the land could revert to the grantor only in the event that it was used in a manner inconsistent with the operation of the railroad, a situation contrary to that found by the District Court in this case. Had Congress desired to make a more restrictive grant of the right of way, there would have been no difficulty in making the contingency for the land's reversion its use for any purpose other than one appropriately specified. Cf. *Caldwell* v. *United States*, 250 U. S. 14; *Los Angeles & Salt Lake R. Co.* v. *United States*, 140 F. 2d 436. But, as we have seen, the congressional policy in 1862 was one of liberality, prodigality as it later came to appear, in order to encourage the construction of the railroad. It is inconceivable that the Congress that made generous loans to the Union Pacific and granted it enormous areas of land for resale at substantial gain would have balked at its profitable resort to the minerals underneath the right of way in a manner completely consistent with the satisfactory operation of the railroad. Further support for this view is provided by § 3 of the 1864 amendment to the Act before us. It gave the railroad power to take by eminent domain a two-hundred-foot right of way over privately owned land, and demonstrates that, in granting four-hundred-foot strips of public land to Union Pacific and Northern Pacific, Congress pursued a conscious policy of providing these railroads with more land than was necessary merely to provide a site for their construction. As the *Baldwin* case recognized, "The right of way for the whole distance of the proposed route was a very important part of the aid given." 103 U. S., at 430. Out of respect for the generous policy embodied in pre-1871 legislation, this Court has until today recognized the railroad's right to enjoy its fee interest in the right of way. See *Northern Pacific R. Co.* v. *Smith*, 171 U. S. 260, 275–276.

It is said that § 3's exception of "mineral lands" from its grant of alternate sections of public land may also have been an inept way of reserving the rights to the minerals underneath the right of way granted by § 2. This attributes to the 1862 Congress a desire to convey only the fee interest in the surface. Such attribution contradicts the scheme both of the Act itself and of subsequent public land legislation. The Act plainly contemplated, and was interpreted to provide, an administrative determination of the mineral character of the land granted by § 3 prior to the issuance of the patent. Land found to be "mineral" was not patented but was replaced by other land. If minerals were subsequently found on patented land, they were held to belong to the railroad, and not to the Government, *Burke* v. *Southern Pacific R. Co.*, 234 U. S. 669, notwithstanding § 3's exception of "mineral lands." Since this exception did not reserve the right to minerals in land that passed under § 3 itself, it is difficult to understand how it could have reserved the right to minerals in land that passed as a right of way under § 2. The fact that the exception was made applicable to the entire Act may be explained without distorting § 2. Sections 9, 13, and 14 of the 1862 Act authorize construction of certain other railroads "upon the same terms and conditions in all respects as are provided in this act for the construction of the" Union Pacific. By amending § 3's proviso to cover the entire Act, Congress left no doubt that the exception of mineral lands also applied to the land grants made to those other railroads.

If Congress had reserved the right to the minerals underlying the thousands of miles of right of way granted by its transcontinental railroad legislation of 1862, 1864 and 1866, it might reasonably be expected that it would have manifested some consciousness of this reservation when, in the Act of July 26, 1866, 14 Stat. 251, it finally settled upon a general federal mineral policy. This is

particularly true in view of the fact that the policy determined was not one of zealously reserving the minerals for the Government but one of making the country's mineral riches readily available for immediate development by private interests. Section 1 of the Act provided "That the mineral lands of the public domain . . . are hereby declared to be free and open to exploration and occupation . . . ." Other sections set forth the conditions for acquiring mineral lands. Yet nowhere in the Act is there intimation of government ownership of the mineral rights now found, for the first time, to have been reserved by Congress in its grants to the railroads in the 1860's.

This failure of Congress to provide for disposition of the minerals lying beneath the right of way may not fairly be attributed to oversight. No congressional policy of reserving mineral rights from public land grants was in existence in the 1860's. Such a policy did not begin to evolve until the last decade of the nineteenth century, when Congress reserved the mineral rights to certain lands sold to cities for cemetery and park purposes, 26 Stat. 502. And it received its first general application in the Act of March 3, 1909, 35 Stat. 844, which permitted agricultural entrymen on public lands subsequently found to contain coal deposits to obtain patents to the land, with coal rights reserved to the United States. The novelty of thus separating surface ownership from ownership of the subsoil was made plain by a colloquy in the House debate on this Act:

> "Mr. Stephens of Texas. I desire to know the difference between this law which the gentleman proposes and the law as it now exists. What change is proposed, and why?
>
> "Mr. Mondell [of Wyoming, Chairman of the House Public Lands Committee]. . . . This bill simply provides that in any case where, subsequent

to the location or the entry, the character of the land has been called into question the entryman may, if he so elect, accept a limited patent.   It is the first legislation before Congress providing for a limited patent, or a patent reserving the mineral. . . .

"Mr. Stephens of Texas. Is it not a fact that valuable minerals are reserved now to the Government?

"Mr. Mondell. No; that is not true.   The patent having issued, the patent carries everything in the land with it . . . .

.          .          .          .          .

"In other words, the patents issued by the Government of the United States heretofore have been patents in fee."   43 Cong. Rec. 2504.[6]

In 1910 the Act was extended to provide for issuance of patents to lands that were known to contain coal at the time they were settled for agricultural purposes.   36

---

[6] The executive officers who sponsored passage of the 1909 Act recognized that they were advocating a new policy.   Secretary of the Interior Garfield's 1907 report to the President stated:

". . . I can not urge too strongly the need of a change in the policy hitherto adopted by the Government for the disposition of the coal land.

". . . The experience in other sections of our country and abroad leads me to believe that the best possible method . . . is for the Government to retain the title to the coal, and to lease under proper regulations which will induce development when needed, prevent waste, and prevent monopoly.   Such a method permits the separation of the surface from the coal and the unhampered use of the surface for purposes to which it may be adapted."   Report of the Secretary of the Interior 15 (1907), H. R. Doc. No. 5, 60th Cong., 1st Sess. 15.

President Theodore Roosevelt's special message to Congress of January 22, 1909, recommended: "Rights to the surface of the public land should be separated from rights to forests upon it and to minerals beneath it, and these should be subject to separate disposal."   15 Messages and Papers of the Presidents 7266.

Stat. 583. The Surface Patent Act of 1914, 38 Stat. 509, applied the statutory policy with respect to coal to all withdrawn non-metallic mineral lands. This Act has been described as "perhaps the first serious attempt, not locally limited, to sever the surface title from the mineral title in disposing of the public domain." Morrison and De Soto, Oil and Gas Rights, 508. It was followed by the Stock-Raising Homestead Act of 1916, 39 Stat. 862, which reserved all minerals to the United States while providing for the granting of surface patents. Significantly, in the comprehensive Mineral Leasing Act of 1920, 41 Stat. 437, Congress did what it had not done in 1866—it set forth a plan for the development of the minerals that the 1909–1916 Acts had reserved for the United States.

The Thirty-seventh Congress was confronted with what it deemed the pressing need to stimulate the rapid construction of a transcontinental railroad. In the Act of 1862 it offered the Union Pacific luring incentives to attempt this task, which "many intelligent persons considered insurmountable." *United States* v. *Union Pacific R. Co.*, 91 U. S. 72, 80. The specific grant contained in § 2 has long been interpreted as conveying the entire present interest in the land forming the right of way. This body of opinions, written by members of the Court more steeped in public land law and more sensitive to the circumstances of the times than we can possibly be, seems to me to constitute too weighty a construction of § 2 to be now overturned. It is of course the Court's duty to enforce the will of Congress once that has been reasonably ascertained from the language in which Congress expressed its will. But the ascertainment of what Congress meant from what it said, in legislation like that before the Court, does not gain clarity with time so as to displace the uniform construction put by this Court from the beginning, almost eighty years ago, on what Congress said. The Court cannot in 1957 retrieve what Congress

granted in 1862. The hindsight that reveals the Act as lavish or even profligate ought not to influence the Court to narrow the scope of the 1862 grant by reading it in the light of a policy that did not mature until half a century thereafter. As the Court said in a very early construction of the Act before us: "No argument can be drawn from the wisdom that comes after the fact." *United States* v. *Union Pacific R. Co., supra,* at 81.

I would affirm the judgment of the Court of Appeals.