UNITED STATES of America,
Plaintiff,

v.

STATE BOX COMPANY, a California
Corporation, Defendant.

Civ. No. 8210.

United States District Court
N. D. California, N. D.

May 28, 1963.

Laurence E. Dayton, U. S. Atty., San Francisco, Cal., for plaintiff.

Dwyer, King & Mering, Sacramento, Cal., for defendant.

HALBERT, District Judge.

This is an action to quiet title to timber on lands owned by the United States and to obtain a declaration that timber previously removed from such land by a purchaser from the United States was lawfully removed. In connection with the Government's quiet title action, defendant has set forth a counterclaim seeking recovery for the value of the timber removed by said purchaser. The parties

are in general agreement as to the basic facts involved. They should be summarized before undertaking a discussion of the controlling issues of law raised by this action.

### The Facts

The case begins with the historic Pacific Railroad Act of July 1, 1862 (12 Stat. 489). In §§ 3 and 9 of that Act, the Union Pacific Railroad Company and the Central Pacific Railroad Company of California were granted every alternate odd section of public lands "to the amount of five alternate sections per mile on each side of said railroad * * * and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, * * * PROVIDED, That all mineral lands shall be excepted from the operation of this act; but where the same shall contain timber, the timber thereon is hereby granted to said company."

This Act was amended by the Act of July 2, 1864 (13 Stat. 356) which, while increasing the land grant to ten odd numbered sections within twenty miles on each side of the railroad, provided "That the phrase 'but where the same shall contain timber, the timber thereon is hereby granted to said company,' in the proviso to said section three, shall not apply to the timber growing or being on any land farther than ten miles from the centre line of any one of said roads or branches mentioned in said act, or in this act." The Pacific Railroad Act (Section 2) also authorized the cutting of timber on the adjoining public lands to the extent necessary for use in construction of the road. As far as can be ascertained, none of the subsequent railroad land grant acts permitted removal of timber from the excluded mineral lands.

The lands concerned in this lawsuit are all located in the State of California, in Section 15, T. 18 N., R. 11 E, M. D. B. & M., and comprise some 390.89 acres. The remaining lands in Section 15 were all patented under mineral patents issued to private individuals at various times between 1874 and 1917.

In 1902, the Central Pacific Railroad Company contracted to sell the *timber* on the lands here involved (and certain other lands not here in issue) to F. A. Birce and E. K. Smart, who were engaged in lumbering operations in the area at that time. In 1906, the contract was completed by execution of a bill of sale conveying the timber only. The purchase price was approximately $3.00 an acre, which was the average price asked by the railroad for *land* at that time.

In 1909, Birce and Smart conveyed to the Nevada County Bank of Grass Valley and, in the following year, the bank conveyed to B. G. Tognazzini and T. C. Tognazzini who, in 1912, conveyed to the Central Mill Company. All of these conveyances covered not only the timber on portions of section 15 but also all of the timber located on the other areas originally conveyed to Birce and Smart.

In 1944, State Box Company purchased all of the outstanding stock of the Central Mill Company, pursuant to Central Mill's dissolution. In June of that year, State Box also purchased all of the outstanding stock of the Tahoe Sugar Pine Company and four days later resold this stock to various individuals who were also officials of State Box. During the course of the dissolution of Central Mill, its Board of Directors adopted a resolution directing that *all* of its remaining property be conveyed to the sole surviving stockholder, State Box. Two deeds were then executed, neither of which included the timber on section 15. The timber was sold by the United States to Grizzly Creek Lumber Company in 1955. On July 29, 1958, two individuals, who had been officers of Central Mill when it dissolved in 1944, executed a deed from Central Mill to State Box, which deed purports to cover all property of Central Mill in the State of California.

In connection with the foregoing title history, two external facts are of some import. First, in 1925, Central Pacific filed a selection list seeking the issuance of a patent on, among other lands, section

15. However, it was determined that this land was mineral and the application was rejected. Second, in 1932, Central Mill entered into a timber-cutting agreement with Tahoe Sugar Pine, covering all of the lands acquired from Birce and Smart by Central Mill *except section 15.*

The Government has set forth its claim to the lands here concerned by virtue of the following facts. On December 18, 1902, these lands were withdrawn for national forest purposes, and, by proclamation dated September 17, 1906, 34 Stat. 3232, they were placed within the Tahoe Forest reserve. They have never been patented by the United States. They have been administered as a part of the Tahoe National Forest, and given the same fire protection and timber care provided for all other lands and timber of the United States in the Forest.

No claim of title to the timber had ever been filed (prior to 1958) by any private party, and the county tax records have never indicated any claim of private ownership, i. e., defendant and its predecessors have never paid taxes on the timber.

In 1937, the United States Forest Service included the timber on these and other lands in a sale to the Tahoe Sugar Pine Company. This sale was completed after publication of a general notice in a Nevada County newspaper, but the contract was canceled (at the purchaser's request) before the Tahoe Sugar Pine Company reached section 15 in its lumbering operations.

Section 321 of the Transportation Act of 1940, (54 Stat. 954, 49 U.S.C. § 65 (b)) provides that upon the filing of a waiver of its remaining land grant claims any railroad will be relieved of existing requirements that it grant special rates to the United States. Waivers filed under this Act, however, do not apply to lands previously patented or certified to the railroad or "prevent the issuance of patents confirming the title to such lands as the Secretary of the Interior shall find have been heretofore sold by any such carrier to an innocent purchaser for value." In regulations relating to this Act (See 43 C.F.R. § 273.65 of 1944 Cum. Supp., and 43 C.F.R. § 273.68) the Secretary of the Interior provided that all railroads filing a release should list all lands previously sold. On October 28, 1940, the Southern Pacific, on behalf of the Central Pacific, filed such a release. That railroad, however, did not at any time list with the United States the 1906 timber sale affecting these lands. Thereafter, when the Southern Pacific Railroad advised the Forest Service with respect to the "innocent purchaser" conveyances that would be excepted from its release it again did not refer to any conveyances affecting this particular land.

In 1949, action was brought under the name of United States v. Waldron, No. 6105 (records of this Court), to enjoin the defendant there from cutting timber on land in section 21, which is relatively near the portion of section 15 here involved. In Waldron the Court held that on the facts relating to that case it had not been established that Waldron had had a reasonable time to remove the timber. State Box, the defendant here, was a party to the Waldron case since it had contracted with Waldron to cut the timber on section 21. Following the Waldron decision, the Forest Service entered into a number of agreements with State Box and Tahoe Sugar Pine Company, affecting other land in the near-by area. Under these agreements, State Box was given a particular time to remove timber from the same type of lands involved here, i. e., mineral lands located within ten miles of the railroad right-of-way. After that time elapsed, State Box was to execute a quit-claim to the United States.

In March, 1955, the United States again advertised for bids to cut and remove timber from section 15 and nearby lands. Among the unsuccessful bidders at this sale was Tahoe Sugar Pine Company. Grizzly Creek Lumber Company was the successful bidder. Grizzly Creek completed its contract, and paid the United States the sum of $86,254.13 with respect to timber cut from section 15. Neither State Box nor

anyone else protested the sale, or at any time objected to the timber cutting on section 15.

In 1958, the General Manager of State Box was advised that the "record title" to the timber on these lands was in the name of the Central Mill Company. In response to this information, State Box, on June 1, 1958, for the first time, asserted a claim to the timber and demanded payment for the amount cut on section 15 by Grizzly Creek. This claim against the Government was rejected in November, 1958.

On February 2, 1959, State Box commenced an action against Grizzly Creek in the Superior Court of the State of California, in and for the County of Sacramento, seeking damages amounting to $120,000 for alleged conversion of its timber. That action was removed to the Superior Court of the State of California in and for the County of Nevada, where it is at issue, and is being held in abeyance for the reason that the title dispute is actually between the United States and State Box, with Grizzly Creek only an innocent bystander.

On April 27, 1960, State Box filed an action against the United States in the Court of Claims, seeking to recover from the United States the value of the timber removed by Grizzly Creek. That action followed by two days the filing of another action by State Box, in the United States District Court for the District of Columbia, seeking to enjoin the Secretary of Agriculture from interfering with State Box's stated plan to remove the remaining timber on section 15.

### The Issues

The Government, in its pleadings in the instant case, has extended three basic prongs to its attack. First, it sets forth the proposition that one to whom timber is granted must exercise his right to remove that timber within a reasonable time. This position is said to result from the general rule of strict construction involved in a grant of property from the United States. In addition, this position is a restatement of the common law rule that when a grant of timber is silent on the subject of the period of time within which the timber must be removed, the grantee loses all right to timber not removed within a reasonable time. The Government's second argument is that the legislative history of the 1862 Act discloses that a grant in perpetuity was not intended. Finally, the Government takes the position that, aside from the question involved concerning the issue of reasonable time for removal, State Box's asserted claims were otherwise lost prior to the 1955 sale, through the doctrines of abandonment, estoppel, laches, and/or adverse possession.

### The Law

It should be noted, preliminarily, that all grants made by the United States "must be construed favorably to the Government and that nothing passes but what is conveyed in clear and explicit language—inferences being resolved not against but for the Government," (Caldwell v. United States, 250 U.S. 14, 20, 39 S.Ct. 397, 398, 63 L.Ed. 816; Great Northern Ry. Co. v. United States, 315 U.S. 262, 272, 62 S.Ct. 529, 86 L.Ed. 836; United States v. Union Pacific Co., 353 U.S. 112, 116, 77 S.Ct. 685, 1 L.Ed.2d 693; United States v. Oregon and California Railroad Co., 164 U.S. 526, 539, 17 S.Ct. 165, 41 L.Ed. 541).

The question is first raised as to whether this action is to be governed by state or federal law, in construing the grants under the 1862 and 1864 Acts. Defendant argues that a distinction exists between the situation where the question presented is whether the United States ever parted with any property in the first place, and the situation where the issue involves the quantum of a government grant. It is apparent that, when dealing with a United States statute which affects real property in numerous States, the law of the United States alone must control the disposition of title to its lands (United States v. Oregon, 295 U.S. 1, 27, 55 S.Ct. 610, 79 L.Ed. 1267). The disposition of such lands is a matter

of the intention of the grantor, the United States.

■ It is true that "if its intention be not otherwise shown it will be taken to have assented that its conveyance should be construed and given effect in this particular according to the law of the state in which the land lies," (United States v. Oregon, supra; State of Oklahoma v. Texas, 258 U.S. 574, 42 S. Ct. 406, 66 L.Ed. 771). The States are powerless, however, to place any limitation or restriction on federal control. The policy set forth in Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, is here applicable, namely that in the absence of a specific statutory provision, the application of state law is denied where it would make identical transactions subject to the vagaries of the laws of the several states. The construction of grants by the United States is a federal, not a state question, and involves the consideration of state questions only insofar as it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction as applicable to its conveyances (United States v. Oregon, supra; Borax Consolidated, Ltd. v. Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L. Ed. 9; United States v. Allegheny County, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209; United States v. Jones, 9 Cir., 176 F.2d 278).

Defendant's contention that a distinction exists between questions raising the issue of whether property passed by grant from the Government and questions raising the issue of legal rights attaching to an admitted grant by the Government of specific property, is without merit. No such distinction was drawn by the Supreme Court in United States v. Union Pacific R. Co., 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693, where these same Acts were interpreted, with reference to the retention of mineral rights. But even were defendant's proposed distinction valid, no benefit would follow therefrom. The present case is not one in which there is merely, as defendant claims, "an admitted grant of specific timber." The situation here present is one in which a major question is whether or not Central Pacific acquired a "limited fee" or a mere right of reasonable use of the timber, in connection with its right-of-way.

Defendant relies on the rule of Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428, that the grants of the Government for lands bounded on streams and other waters, without any reservations or restriction of terms, are to be construed, as to their effect, according to the law of the state in which the lands lie. That rule, however, is inapplicable to the instant case. The Hardin case dealt with a limited grant within one State, with the issue resolving itself as one of describing and bounding the property involved. In the present case a federal action is involved, and a clear Congressional intent is made manifest (See: United States v. Union Pacific R. Co., 91 U.S. 72, 23 L.Ed. 224).

■ Consideration here of the legislative intent in passing the 1862 and 1864 Acts is appropriate. Noting the policy of strict construction of land grants in favor of the Government, it must be assumed that Congress made such grants with knowledge of the common-law principle that such grants of timber must be removed within a reasonable time. While it is true that the grants of timber were for the benefit of the railroads in encouraging them to complete construction of a transcontinental line, it cannot be assumed that such encouragement was meant to extend to completely unrelated activities of those railroads (See: United States v. Union Pacific R. Co., supra).

The original 1862 Act contained a provision requiring the railroad to sell all of its grant within three years, failing which the United States could sell the land itself, turning over the proceeds received therefrom to the railroads. This indicates an intention to give the railroads a source of income and credit *to aid them in constructing the road*. With reference to the specific language "but where the same shall contain timber, the

timber thereon is hereby granted to the said company," Congressman Wilson of Massachusetts stated (Cong. Glove, 37th Cong. 2d sess. 2813, Part 3):

"I will simply say in support of the amendment that one of the great difficulties of *constructing and running* a Pacific railroad will be the want of timber, and, therefore, as these lands are covered with timber, I hope this amendment will be adopted. It will be for the interests of the country." (Emphasis added).

■ Noting the language used, the Court in Carr v. Central Pacific Railroad, 55 Cal. 192, stated: "The language seems to be about as broad as it can be; that 'the timber thereon is hereby granted.'" Under general principles of real property law, a grant is an absolute conveyance of property. But note should also be taken of the fact that while the owner of land may convey an absolute estate in timber with the perpetual right to enter and remove it, the intention to give such right must clearly and definitely appear (Kalnoski v. Carlisle Lumber Co., 17 Wash.2d 662, 137 P.2d 109; Nelson v. McKinney, 163 Wash. 529, 1 P.2d 876 and see 54 C. J.S. Logs and Logging § 19, p. 704).

Defendant can gain no comfort from United States v. Waldron, No. 6105, records of this Court. There is language in that case, to be sure, that the rule of Gibbs v. Peterson, 163 Cal. 758, 127 P. 62, was to be applied. But the results of the Waldron case were that additional time was given the defendants to exercise their rights of cutting timber (along with a finding that a reasonable time had *not* passed during which the timber should have been cut). Later, on March 30, 1953, a final decree was entered in the case adjudging that the defendants had exercised their rights of cutting timber, that they no longer had any right, title or interest in such timber, *and that the Government was then the legal owner of all remaining timber* on said land. In other words, the reference to Gibbs v. Peterson was specifically for the purpose of framing an order allowing the Waldrons to continue cutting on the land in-

volved for a specified time, after which time the timber would revert back to the Government.

From the above law it is clear that, in considering the effect of the actions of the parties involved here, this Court must look to federal, rather than to state law.

The general rule is that a conveyance of timber will not be construed as giving a perpetual right unless such an intention clearly appears. Timber contracts specifying no time for removal are ordinarily held to require a removal within a reasonable time (See Annotations, 15 A.L.R. 51, 31 A.L.R. 946, and 71 A.L.R. 144). We come then to the question of whether a reasonable time has elapsed in the present case.

■ What constitutes a reasonable time for removal of timber is a mixed question of fact and law (54 C.J.S. Logs and Logging § 19, p. 705). Among the factors to be considered in determining whether there has been a reasonable time for removal are included the location, the condition and nature of the timber, the quantity thereof, its accessibility, facilities for cutting and removal, and obstacles opposing such removal. A period as short as five years has been held an unreasonable time (Faulkner v. Allen, 70 Okl. 280, 173 P. 1133), but it has also been indicated that in the absence of any time limit for removal, unexercised timber rights might be upheld even after more than fifty years (Crain v. Hoefling, 56 Cal.App.2d 396, 132 P.2d 882).

The Waldron case is particularly noteworthy in this particular, inasmuch as a specific finding was there made that a reasonable time had not elapsed during which the defendants would have been compelled to exercise their cutting rights. The Waldron case involved land within section 21, in close proximity to the land of section 15 involved here. Assuming the same factors to be present with regard to section 15 land as were present in the Waldron case, the next question to be resolved is whether there has been any change in circumstances since 1950

which would suggest a different result in this case.

Following the Waldron case, the Government entered into agreements with a number of similarly situated timber claimants, including the defendant, whereby timber was then removed within a reasonable time, and a quit-claim deed executed to the United States. The section 15 land was not included within this general disposition following Waldron. No protest was lodged by defendant to the 1955 sale to Grizzly Creek. In fact, by its own admission, defendant did not even know of its alleged claim until 1958.

In addition to the subsequent history of the section 15 land after the Waldron case, the Government points to certain facts as distinguishing the present case from that one. First, the original Waldron conveyance was directed to the attention of the Forest Service in a letter from the Southern Pacific dated January 12, 1945. Second, Waldron paid taxes continuously from 1903, and from 1924 to 1937 paid the Forest Service a fire protection tax. He also entered into two timber sale contracts relating to the timber involved. Finally, since the Waldron decision, a particularly good lumber market has existed; there have been large scale timber operations in the area, and a road referred to in Waldron has been in continuous existence.

■ In view of the above facts, it is the conclusion of this Court that there has been the passage of an unreasonable time during which defendant has not exercised its asserted right to cut timber located on section 15.

■ Since an unreasonable time has passed during which State Box and/or its predecessor have failed to exercise the right of removing timber from such lands, the importance of the application of federal law is made apparent. Under the law of California, forfeitures are to be avoided, at practically all costs (Freedman v. Rector, 37 Cal.2d 16, 230 P.2d 629, 31 A.L.R.2d 1; Barkis v. Scott, 34 Cal. 2d 116, 208 P.2d 367; and see Union Bond & Trust Company v. Blue Creek Redwood Co., D.C., 128 F.Supp. 709, aff'd Ward v. Union Bond & Trust Company, 9 Cir., 243 F.2d 476). But the general law, as must be applied to a federal grant of timber, is to the effect that where the deed or contract fixes no time for removal of the timber, the vendee forfeits all right to timber not removed within a reasonable time (United States v. Wheeler, D.C., 161 F.Supp. 193). Such being the law, title to the timber here involved must be quieted in the Government (for the benefit of Grizzly Creek Lumber Company).

As separate and alternative grounds for its position, the Government sets forth four arguments which are not directly related to the question of whether the timber was removed within a reasonable period, but which do in fact deal with that question. The most pertinent fact offered in support of these arguments of abandonment, estoppel, laches, and adverse possession, is the point that no action was taken by State Box's predecessor, Central Mill, in 1937 when this timber was advertised for sale and a contract was awarded to Tahoe Sugar Pine Company. (Particularly noteworthy here is the fact that the majority of the shareholders of State Box were also majority shareholders in Tahoe Sugar Pine). Also important is the fact that no taxes on this property were paid either by State Box or by Central Mill. To this can be added the facts that the Government has incurred the administrative expense of administering this land and timber as part of Tahoe National Forest, and that there was no open possession either by State Box or by Central Mill at any time after the 1937 sale. These facts, taken together, point to the inescapable conclusion that State Box is estopped to claim this timber as against the Government, because of State Box's failure to assert its interest in this property. Admittedly, the reason for such failure was the lack of knowledge of State Box of such claim until 1958. But the doctrine of estoppel is not confined to the individual party claimant. State

Box's predecessor, Central Mill, was guilty of failing to act to protect its property, at a time when it had notice that action was being taken with respect to it. The acts, and failures to act, of Central Mill can be, and will be, asserted against State Box.

Having reached the above conclusions regarding the original action, this Court need not consider defendant's counterclaim.

Let judgment be entered in favor of the plaintiff and against the defendant as prayed for by the plaintiff.

Plaintiff will prepare findings of fact and conclusions of law, a form of judgment, and all other documents necessary for the complete disposition of this case, and lodge such documents with the Clerk of this Court, pursuant to the applicable rules and statutes.

It Is So Ordered.