Joseph M. BURKE, as Stockholder of the Gulf, Mobile & Ohio Railroad Company, etc., Plaintiff-Appellant,

v.

GULF, MOBILE AND OHIO RAILROAD COMPANY, etc., et al., Defendants-Appellees.

No. 72–1143.

United States Court of Appeals, Fifth Circuit.

Sept. 12, 1972.

Irvin J. Langford, Howell, Johnston, Langford & Finkbohner, Mobile, Ala., for plaintiff-appellant.

Sam W. Pipes, III and Norton Brooker, Lyons, Pipes & Cook, Mobile, Ala., for G. M. & O. Railroad Co.

William H. Cox, Jr., Jackson, Miss., for Pearl Production Co.

Ben H. Harris, Jr., Mobile, Ala., for Merchants National Bank.

Thornton Price-William, pro se.

H. S. Jernigan, pro se.

T. E. Twitty, Sr., Mobile, Ala., for Alabama Power Co.

S. P. Gaillard, Jr., Mobile, Ala., for S. P. Gaillard, Jr. and others.

Joseph H. Howie, Jackson, Miss., for M. M. McGowan.

Hardy B. Smith, Gaillard, Wilkins & Smith, Mobile, Ala., for Raymond H. Lloyd.

Edwin J./Curran, Jr., Mobile, Ala., for Alma D. Johnson and Fred E. Roan.

J. E. Skinner, Jackson, Miss., for George W. Harrison, Jr. and E. E. Harrison.

Ben Kilborn, Mobile, Ala., for Vincent F. Kilborn and River Towboats, Inc.

James L. Spencer, Jackson, Miss., for R. W. Hyde, Jr.

James L. May, Jr., Mobile, Ala., for Standard Oil Co.

Harry H. Riddick, Mobile, Ala., for The Roger Williams Development Co.

A. Paul Cadenhead, Atlanta, Ga., for Estate of O. J. Parker, Jr., deceased.

Swep S. Taylor, Jr., Jackson, Miss., for R. G. Duke, Jr. and Gammill Investment Co.

D. R. Coley, Jr., Mobile, Ala., for D. R. Coley, Jr. and Warren E. Odom.

David W. Green, Sidney H. Schell and Victor T. Hudson, Pillans, Reams, Tappan, Wood, Roberts & Vollmer, Mobile, Ala., for Elsie M. Schwartz and others.

James W. Dorsey, Atlanta, Ga., for the Estate of O. J. Parker.

Before TUTTLE and COLEMAN, Circuit Judges, and R. BLAKE WEST, District Judge.

COLEMAN, Circuit Judge:

Except where additional widths have been purchased in transactions not involved in this litigation, the Gulf, Mobile and Ohio Railroad Company, successor to the originally organized Mobile and Ohio Railroad Company, claims a right-of-way one hundred feet wide through what has become the Citronelle Oil Field near Mobile, Alabama.

Joseph M. Burke, the owner of twenty-five shares of stock of the Railroad Company, sought to have the Railroad claim title to an additional strip of not less than twenty-five nor more than fifty additional feet on each side of the right-of-way. The Board of Directors and the stockholders of the Company unanimously rejected the proposal. It is undisputed that the pursuit of such a claim would necessitate litigation against numerous persons or corporations who claim an interest in the additional strips of land. The origin and motivation of Mr. Burke's claim are fully set forth in the reported opinion of the District Court, Burke v. Gulf, Mobile and Ohio Railroad Company, 324 F. Supp. 1125 (S.D., Ala., 1971).

After being rebuffed by the Railroad directors and stockholders, Mr. Burke brought a stockholder's derivative suit against, and for the benefit of, the Railroad, "to construe two Acts of Congress and to fix and determine the width of the right-of-way of said Gulf, Mobile and Ohio Railroad Company", for an accounting on behalf of the Railroad for all oil, gas, and other minerals removed from the right-of-way for which payment has been made to persons other than the Railroad, etc.

The District Court dismissed the complaint, Burke v. Gulf, Mobile and Ohio Railroad Company, *supra.*

We affirm the judgment of the District Court.

Jurisdiction was asserted under 28 U. S.C. § 1331 (the federal question statute). Since the primary issue, standing at the very inception of the alleged title to the strips of land in question, involves an interpretation of two Acts of Congress, both passed over a hundred years ago, we are of the opinion that the District Court did have jurisdiction, see 324 F.Supp. at 1128.

I

*The 1849 Act of Congress*

The Act of March 3, 1849, read as follows:

*"March 3, 1849.* Chap. CXVII.— An Act to grant the Right of Way to the Mobile and Ohio Railroad Company.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the right of way is hereby granted to the Mobile and Ohio Railroad Company for the railroad contemplated by said company to be constructed from Mobile to the northern terminus on the Ohio or Mississippi Rivers, at or near the mouth of the Ohio, and the said company is hereby authorized to locate said road through any of the public lands of the United States which may lie on the route which may be selected for the location of said road; and the said company is hereby authorized to survey and mark through the said public lands the track of said road one hundred feet in width, and, furthermore, an additional quantity of twenty-five feet in width on each side of said road along the same, which land shall be reserved from sale, and the title whereof shall be vested in the State wherein such land shall lie, for the use of said rail-

road company forever, and for no other use whatever.

"Sec. 2. And be it further enacted, That the said Mobile and Ohio Railroad Company shall have the privilege, and the same is hereby granted to them, to cut and use all such timber, and to use all earth, stone, sand, gravel, mineral, and other materials on the public lands of the United States, which may be necessary for the construction or repair of said road, and to build bridges, or construct buildings, truss work, or other erections, such as the same may require, and use such water as may be wanted, and cross such streams as shall be necessary for the completion and use of said road: PROVIDED, That the said railroad company, when the said railroad shall be completed, shall carry the mails of the United States on such terms as the Postmaster-General shall be able to contract, for similar services, with other railroad companies.

"APPROVED, March 3, 1849."

It seems to us that the meaning, purpose, and content of this Act of Congress are clear enough to avoid any uncertainty, or speculative ambiguities, now over a hundred years after the enactment.

The title states that it is "An Act to grant the Right of Way to the Mobile and Ohio Railroad Company".

The Act then proceeds to make directly to the Mobile and Ohio Railroad Company such a grant to a right-of-way one hundred feet wide "through any of the public lands" to be traversed by the railroad track, to be constructed from Mobile to "its northern terminus on the Ohio or Mississippi Rivers, at or near the mouth of the Ohio".

An additional twenty-five feet in width on each side of the road was "reserved from sale [as a part of the public lands]" and title therein was reserved [as to the Citronelle area] to the State, "for the use of said railroad company forever and for no other use whatever".

We thus have no difficulty in holding that upon the construction of the railroad title in a right-of-way one hundred feet wide vested in the Mobile and Ohio, but title to the additional twenty-five feet on each side of the right-of-way, as the Act clearly states, was reserved to the State of Alabama, but for "the use of the said railroad company and for no other use whatever".

The second section of the Act gave the Railroad a license to use all such timber, earth, stone, gravel, minerals, and other materials on the public lands, not limited to the right-of-way, which may be necessary for the construction or repair of said road, and related purposes, further providing that the Railroad should carry the mails under the conditions therein prescribed.

This is where matters stood from March 3, 1849 until the enactment of the Act of September 20, 1850, 9 Stat. 466, the second Act of Congress upon which the appellant relies.

Because of its length, the Act of 1850 will be annexed to this opinion as an Appendix.

We note, first, that this Act makes no reference, in terms of express amendment or otherwise, to the Act of 1849. Moreover, the name of the Mobile and Ohio Railroad Company was not mentioned.

Quite obviously, the purpose of this statute was to encourage and assist the construction of a railroad from near Chicago to a point at or near the junction of the Ohio and Mississippi Rivers, with a branch to run from Chicago, *via* Galena, to Dubuque.

While the Act granted to the State of Illinois a right-of-way of no prescribed width, being content to say that it should not exceed one hundred feet on each side of the track, the essence of the legislation, in which the "Central" Railroad was named, was that it granted to the State of Illinois (not the railroad) "every alternate section of land designated by even numbers, for six sections in width on each side of said road and

branches", concluding with a system of land substitution in those instances where the designated land had already been granted to others. This is how the Illinois Central Railroad from Chicago to Cairo, Illinois, had its origins, and how it received a substantial subsidy from the United States for the construction of its road. We know from recorded history, of course, that Senator Stephen A. Douglas, of Illinois, was an enthusiastic sponsor of this legislation.

Congress knew that it had already granted to the Mobile and Ohio Railroad a right-of-way one hundred feet wide across the public lands from Mobile to a point on the Mississippi or the Ohio, near the mouth of the Ohio. So, in Section 7 of the 1850 Act it proceeded to make land grants available to that Railroad, in the following terms:

"Sec. 7. And be it further enacted, That in order to aid in the continuation of said Central Railroad from the mouth of the Ohio River to the city of Mobile, all the rights, privileges, and liabilities hereinbefore conferred on the State of Illinois shall be granted to the States of Alabama and Mississippi respectively, for the purpose of aiding in the construction of a railroad from said city of Mobile to a point near the mouth of the Ohio River, and that public lands of the United States, to the same extent in proportion to the length of the road, on the same terms, limitations, and restrictions in every respect, shall be, and is hereby, granted to said States of Alabama and Mississippi respectively."

Since Congress had already granted a right-of-way directly to the Mobile and Ohio Railroad Company, it is obvious: (1) The Railroad already owned the right-of-way to a width of one hundred feet; (2) The Congress could not grant to the State of Alabama that which it had already granted to the Railroad; (3) Upon consideration of Section 7 in context we interpret it to have dealt only with the grant of lands in Alabama and Mississippi, and not to

right-of-way. Property interests granted by the United States are to be construed according to the clear language of the grant, United States v. Union Pacific Railroad Company, 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957).

We next encounter the Act of the State of Alabama, approved December 1, 1851, Acts of 1851–1852, page 45, which reads as follows:

"Accepting of the donation of lands made by the Congress of the United States to aid in the construction of a rail road from the city of Mobile to the mouth of the Ohio river.

"Sec. 1. Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly Convened, That the lands within this State which, under the said act of Congress, have been or may be hereafter entered in conformity with its provisions, shall vest full and complete title in the 'Mobile and Ohio railroad company', for the purposes set forth in said act of Congress, as soon as the said company shall execute and deliver to the governor of the State a sufficient bond faithfully to use the said lands for the purposes of its donation, and to abide by and perform the provisions and conditions in the said act contained."

It is of considerable interpretative importance to note that while the Congressional Act of 1850 referred in both title and content to rights-of-way and lands as separate categories, the 1851 Act of the Alabama legislature referred only to *the donation of lands* (emphasis added) made by the Congress of the United States to aid in the construction of a railroad from the city of Mobile to the mouth of the Ohio River".

This leads us to believe that the Alabama legislature understood, as we have held, that Section 7, tacked onto a bill which primarily was for the benefit of Illinois, referred only to the donated sections of land, as distinguishable from rights-of-way.

Even if we should be mistaken in this, the Alabama Act of 1851 made no reference whatever to rights-of-way, but only to donated *lands*. Of course, as to the one hundred foot right-of-way granted directly to the Mobile and Ohio in 1849 the railroad held a title paramount to that of the state, so there was no necessity for mentioning it in the 1851 State legislation. It must be noted, however, that the twenty-five foot right-of-way on each side of the Railroad, reserved to Alabama by the 1849 Act, was just that —right-of-way, not donated lands—and the 1851 Alabama Act is devoid of any reference to rights-of-way.

All this leads us to conclude that the right-of-way of the Gulf, Mobile and Ohio Railroad has to be one hundred feet wide and no more. It is a rational explanation for the reluctance of the Railroad to claim a right-of-way in excess of that amount in the area around Citronelle.

■ Let us make this clear. In its present posture this is not a suit to try title to land or interests in real estate. It is a suit in which a minority stockholder seeks to have it done. Our opinion, therefore, goes only to our interpretation of the Acts of Congress, upon which the attempted derivative suit was based, and is not *per se* an adjudication of title. What we do hold is that the title of the Gulf, Mobile and Ohio to anything more than one hundred feet is, at best, so thoroughly unclear as to justify a discreet unwillingness on the part of the Railroad to institute such a suit.

Such litigation, if ordered by the District Court, could lead to similar litigation at points anywhere from Mobile to the Mississippi-Tennessee boundary, a distance of over three hundred miles.

While the complaint purports to deal only with rights-of-way through lands owned by the United States in 1849 and 1850, we take judicial notice of the many complications which might be encountered for a good distance North of Mobile.

After the French and Indian War, Great Britain received East and West Florida from Spain, in return for Havana, which had been captured by the British. In 1764 a line was drawn from the Chattahoochee to the junction of the Yazoo and Mississippi Rivers as the Northern boundary of British West Florida. The Treaty of 1783, at the close of the American Revolution, gave Florida back to Spain. By 1798 Spain had withdrawn behind the 31st parallel, about one hundred miles South of the former boundary. The British, prior to 1783, granted lands to private individuals at points as much as a hundred miles North of Mobile, see, e. g., Land Deed Book A, Page 3, Land Deed Records of Washington County, Alabama. After 1783, the Spanish continued the practice, see, e. g., American State Papers, Volume 1, Page 683.

Although claimed by the United States under the Louisiana Purchase, the acquisition of the territory South of the 31st parallel had a long and involved history. The Spanish did not leave Mobile until 1812. An Act of Congress, May 14, 1812, 2 Stat. 734, annexed to Mississippi Territory the land between the 31st degree of North Latitude and the Gulf, and from the Pearl to the Perdido. Incidentally, the Town of Citronelle is situated about five miles North of the 31st parallel.

Leaving this aside, there is no way of knowing the number or the nature of the property interests acquired since 1849, all the way from Mobile to Tennessee, and now outstanding. An extreme reluctance to move into such an impenetrable, ultra-expensive legal morass is easy to comprehend.

We conclude, therefore, that the District Court committed no error in holding that this case failed to raise any substantial issue that the Directors and Stockholders of the Railroad, in the exercise of the discretion devolving upon them, manifested such "fraud, excess, abuse of discretion, or violation of good business judgment", as would support a

derivative action by a minority stockholder, see 324 F.Supp. at 1129.

The judgment of the District Court is Affirmed.

## APPENDIX

CHAP. LXI.—An Act granting the Right of Way, and making a Grant of Land to the States of Illinois, Mississippi, and Alabama, in Aid of the Construction of a Railroad from Chicago to Mobile.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the right of way through the public lands be, and the same is hereby, granted to the State of Illinois for the construction of a railroad from the southern terminus of the Illinois and Michigan Canal to a point at or near the junction of the Ohio and Mississippi Rivers, with a branch of the same to Chicago, on Lake Michigan, and another via the town of Galena in said State, to Dubuque in the State of Iowa, with the right also to take necessary materials of earth, stones, timber, etc., for the construction thereof: Provided, That the right of way shall not exceed one hundred feet on each side of the length thereof, and a copy of the survey of said road and branches, made under the direction of the legislature, shall be forwarded to the proper local land offices respectively, and to the general land office at Washington city, within ninety days after the completion of the same.

Sec. 2. And be it further enacted, That there be, and is hereby, granted to the State of Illinois, for the purpose of aiding in making the railroad and branches aforesaid, every alternate section of land designated by even numbers, for six sections in width on each side of said road and branches; but in case it shall appear that the United States have, when the line or route of said road and branches is definitely fixed by the authority aforesaid, sold any part of any section hereby granted, or that the right of preemption has at-

tached to the same, then it shall be lawful for any agent or agents to be appointed by the governor of said State, to select, subject to the approval aforesaid, from the lands of the United States most contiguous to the tier of sections, above specified, so much land in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold, or to which the right of preemption has attached as aforesaid, which lands, being equal in quantity to one half of six sections in width on each side of said road and branches, the State of Illinois shall have and hold to and for the use and purpose aforesaid: Provided, That the lands to be so located shall in no case be further than fifteen miles from the line of the road: And Further Provided, The construction of said road shall be commenced at its southern terminus, at or near the junction of the Ohio and Mississippi Rivers, and its northern terminus upon the Illinois and Michigan Canal simultaneously, and continued from each of said points until completed, when said branch roads shall be constructed, according to the survey and location thereof:

Provided Further, That the lands hereby granted shall be applied in the construction of said road and branches respectively, in quantities corresponding with the grant for each, and shall be disposed of only as the work progresses, and shall be applied to no other purpose whatsoever: And Provided Further, That any and all lands reserved to the United States by the act entitled "An Act to grant a quantity of land to the State of Illinois, for the purpose of aiding in opening a canal to connect the waters of the Illinois River with those of Lake Michigan", approved March second, eighteen hundred and twenty-seven, be, and the same are hereby reserved to the United States from the operation of this act.

Sec. 3. And be it further enacted, That the sections and parts of sections of land which, by such grant, shall remain to the United States, within six miles on each side of said road and

branches, shall not be sold for less than double the minimum price of the public lands when sold.

Sec. 4. And be it further enacted, That the said lands hereby granted to the said State shall be subject to the disposal of the legislature thereof, for the purposes aforesaid and no other; and the said railroad and branches shall be and remain a public highway, for the use of the government of the United States, free from toll or other charge upon the transportation of any property or troops of the United States.

Sec. 5. And be it further enacted, That if the said railroad shall not be completed within ten years, the said State of Illinois shall be bound to pay to the United States the amount which may be received upon the sale of any part of said lands by said State, the title to the purchasers under said State remaining valid; and the title to the residue of said lands shall reinvest in the United States, to have and hold the same in the same manner as if this act had not been passed.

Sec. 6. And be it further enacted, That the United States mail shall at all times be transported on the said railroad under the direction of the Post-Office Department, at such price as the Congress may by law direct.

Sec. 7. And be it further enacted, That in order to aid in the continuation of said Central Railroad from the mouth of the Ohio River to the city of Mobile, all the rights, privileges, and liabilities hereinbefore conferred on the State of Illinois shall be granted to the States of Alabama and Mississippi respectively, for the purpose of aiding in the construction of a railroad from said city of Mobile to a point near the mouth of the Ohio River, and that public lands of the United States, to the same extent in proportion to the length of the road, on the same terms, limitations, and restrictions in every respect, shall be, and is hereby, granted to said State of Alabama and Mississippi respectively.

Approved, September 20, 1850.