## UNITED STATES *v.* UNION PACIFIC RAILWAY COMPANY

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 149.  Argued March 20, 21, 1893. — Decided April 10, 1893.

The right conferred by the act of July 1, 1862, 12 Stat. 489, c. 120, as subsequently amended, upon the corporation afterwards known as the Union Pacific Railway Company, Eastern Division, to construct its road substantially in a direct line to Denver, and from thence northerly, to connect with the Union Pacific Railroad at Cheyenne, and to acquire a grant of public lands thereby upon each side of its railroad as constructed, was not affected by the act of March 3, 1869, 15 Stat. 324, c. 127, in such a way as to make the Union Pacific, Eastern Division, terminate at Denver, and

to cause its land grants to terminate there; but, on the contrary, the act of 1862, being a grant *in præsenti*, the Company's right to lands upon each side of its road became fixed from the moment it proceeded, under the act of 1866, to establish its line of definite location so as to make the same extend from Kansas City westwardly to Denver, and thence northwardly to Cheyenne, and the act of 1869 is not to be construed as breaking the continuity of the line.

If there were any doubt with regard to the interpretation of the act of 1869, the construction placed upon it by the Land Department for eighteen years, under which lands have been put upon the market and sold, would be entitled to considerable weight.

THIS case arose upon demurrers and a plea to a bill in equity filed by the United States against the Union Pacific Railway Company, and 173 other corporations and individuals, to procure the surrender and cancellation of certain land patents issued to the Kansas Pacific Railway and the Denver Pacific Railway and Telegraph Company, and for a decree declaring all conveyances of such lands clouds upon the title of the United States.

The bill averred in substance that, by an act of Congress of July 1, 1862, 12 Stat. 489, c. 120, incorporating the Union Pacific Railroad Company, such company was authorized to construct a road from a point on the one hundredth meridian longitude, between the south margin of the valley of the Republican River and the north margin of the valley of the Platte River, in the Territory of Nebraska, to the western boundary of Nevada, and was granted every odd-numbered section of land amounting to *five* alternate sections of land per mile, afterwards extended to *ten* sections by the act of July 2, 1864, 13 Stat. 356, c. 216, on each side of said railroad, on the line thereof, and within the limits of *ten* miles, (subsequently increased to *twenty*,) on each side of the road; and that whenever the company should have completed *forty* consecutive miles of its road, (afterwards reduced to *twenty*, by the same act of 1864,) patents should issue for such public lands as had been granted to it, and had been earned in accordance with the provisions of the act.

By the same act it was further provided that the Leavenworth, Pawnee and Western Railroad Company, which had

been chartered by the Territory of Kansas, in 1855, was authorized to construct a line of road from the Missouri River, at the mouth of the Kansas River, to the aforesaid point, on the one hundredth meridian. The corporate name of the said Leavenworth, Pawnee and Western Railroad Company of Kansas was, subsequently to the passage of this act, changed to that of the Union Pacific Railway Company, Eastern Division.

On July 3, 1866, Congress passed another act, 14 Stat. 79, c. 159, amending those of July 1, 1862, and July 2, 1864, and providing that the Union Pacific Railway Company, Eastern Division, should be authorized to so change the line of its definite location as to connect with the Union Pacific Railroad at a point not more than fifty miles westward from the meridian of Denver in Colorado.

The bill further averred that after the passage of this act of July 3, 1866, the Union Pacific Railway Company, Eastern Division, so changed its line of definite location as to make the same extend from its point of beginning at Kansas City, Missouri, westward, and substantially in a direct line to the city of Denver, Colorado, and from that point northward and substantially in a direct line to a connection with the Union Pacific Railroad at Cheyenne, Wyoming, and proceeded to build its road on that line towards Denver.

Before the Union Pacific had completed its line to Denver, and on March 3, 1869, Congress passed another act, 15 Stat. 324, c. 127, authorizing the Union Pacific Railway Company, Eastern Division, to contract with the Denver Pacific Railway and Telegraph Company, a Colorado corporation, for the construction, operation and maintenance of that part of its line of railroad and telegraph between Denver and its point of connection with the Union Pacific Railroad at Cheyenne, and to adopt the road-bed already graded by the said Denver Pacific Railway and Telegraph Company as said line, and to grant to said Denver Pacific Railway and Telegraph Company the perpetual use of its right of way and depot grounds, and to transfer to it all its rights and privileges subject to all the obligations pertaining to said part of its line. It was also made the

duty of such road to extend its railroad and telegraph to a connection at the city of Denver, so as to form with that part of its line herein authorized to be constructed a continuous line of railroad and telegraph from Kansas City, by way of Denver, to Cheyenne. It was further declared, section 2, that "all the provisions of law for the operation of the Union Pacific Railroad, its branches and connections, as a continuous line, without discrimination, shall apply the same way as if the road from Denver to Cheyenne had been constructed by the said Union Pacific Railway Company, Eastern Division." It was further provided that each of said companies should receive patents to alternate sections of land along their respective lines of road, as therein defined, in like manner and within the same limits as provided by law in the case of lands granted to the Union Pacific Railway Company, Eastern Division. Upon the same day, a joint resolution was passed, 15 Stat. 348, authorizing the Union Pacific Railway Company, Eastern Division, to change its name to the Kansas Pacific Railway Company.

In pursuance of these acts the new Kansas Pacific Railway Company entered into a contract with the Denver Pacific of the nature and for the purpose set out and authorized by the acts, and, in pursuance thereof, the Kansas Pacific completed its line to Denver, and the Denver Pacific completed its line from Denver to Cheyenne.

The bill thereupon charges that, in procuring the passage and accepting the terms of the act of March 3, 1869, the Kansas Pacific abandoned its intention of building a line of road to connect with the Union Pacific at Cheyenne, and, therefore, that Denver became the terminus of its road, and the company surrendered all its rights to that portion of the land grant lying beyond its terminus at Denver, and, by operation of this act, sections of public land within prescribed limits were granted to the Denver Pacific as a new and independent grant; that the Kansas Pacific and the Denver Pacific having completed their lines of road, they respectively became entitled to certain portions of the land grant independently of each other, notwithstanding the fact that, through their con-

nections at Denver, they formed a continuous line of railway from Kansas City to Cheyenne; and their rights to public lands, under the several acts aforesaid, extended only laterally along the lines of said roads respectively, and were comprised and limited by lines drawn through the terminus of each of said roads at right angles to the general direction of the lines of said roads. The bill then referred to a map, Exhibit A, as showing the lines of said roads as connected at the city of Denver, their general courses and directions as they extend eastwardly and northwardly from the city of Denver, and the lines by which the rights of said respective companies to public lands, under the acts aforesaid, are limited; that west of the legal terminal limit of the Kansas Pacific land grant, and south of the legal terminal limit of the Denver Pacific land grant, lies a large triangular tract of land of about 200,000 acres, substantially within a radius of 20 miles of the point of connection of the two roads at Denver, which the bill alleges was not within the legal limit of the land grant to either of the two companies, and to the odd-numbered sections of which they asserted claim, and for which they procured patents from the Interior Department, the surrender and cancellation of which said patents it was the object of the bill to secure.

The bill further alleged the consolidation, in January, 1880, of the Kansas Pacific and the Denver Pacific and the Union Pacific Railroad Company into one corporation, under the corporate name of the Union Pacific Railway Company, which became the successor in interest of the three prior corporations; that certain persons, who were made defendants to the bill, claimed title to certain lands of this tract by direct or mesne conveyances from these companies, of the exact nature of which titles plaintiff is ignorant; that, under an act of March 3, 1887, providing for the adjustment of land grants made by Congress to aid in the construction of railroads, etc., the Secretary of the Interior ascertained that the lands described in the bill had been erroneously and illegally patented, as herein set out, and thereupon made a demand upon the Union Pacific Railway Company, as successor in interest to

the others, for a reconveyance of the tracts of land so erroneously patented, which was refused. .

The persons claiming title under these patents having been made parties to the bill, it prayed that the patents and other outstanding deeds and other evidences of title be decreed to be void and surrendered for cancellation as clouds upon the plaintiff's title, and for such other relief as might seem proper.

To this bill demurrers were filed by most or all the defendants, except one Standley, who filed a plea setting up divers statutes and decisions in the land office upon which it is claimed the patents rested, but which need not be specifically stated. Upon the hearing upon these demurrers and plea, the court made an order sustaining them, 37 Fed. Rep. 551, and the plaintiff having elected to stand by its bill as originally filed, it was further ordered that the same be dismissed. Thereupon the plaintiff appealed to this court.

*Mr. Assistant Attorney General Maury* for appellant.

*Mr. John F. Dillon,* (with whom was *Mr. Harry Hubbard* on the brief,) for the Union Pacific Railway Company and Joseph Standley.

*Mr. Oscar Reuter* filed a brief for Joseph Standley and others.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The object of this bill is to procure the surrender and cancellation of certain patents issued for a triangular tract of land of about 200,000 acres in extent, lying upon the outside of the right angle, or elbow, made by the junction at Denver of the Kansas Pacific Railway, whose general course is east and west, with the Denver Pacific Railway and Telegraph Company, whose general course is north and south. These roads are now consolidated under the name of the Union Pacific Railway Company.

By the original act of July 1, 1862, incorporating the Union Pacific Railroad Company, 12 Stat. 489, c. 120, this company was empowered to construct a road from a point on the one hundredth meridian, between certain north and south limits, to the western boundary of Nevada, and by the same act a Kansas corporation was empowered to construct its line from the Missouri River westwardly to the initial point of the Union Pacific at the one hundredth meridian, and to connect with the latter road at that point. Subsequently, and in 1866, the Kansas corporation, whose name had meantime been changed to the Union Pacific, Eastern Division, was authorized to so change its line as to connect with the Union Pacific at a point not more than fifty miles westward from the meridian of Denver. Acting upon this, the company did change its line so as to make the same extend from Kansas City westward in a direct line to Denver, and thence northward in a direct line to Cheyenne. By the original act, the Union Pacific was to receive a grant of five alternate sections of land for every mile, (subsequently raised to ten,) on each side of the road, and as the Kansas corporation was to construct its road "upon the same terms and conditions in all respects" as the Union Pacific, it followed that it was entitled to the same land grant. The act authorizing the Kansas corporation to change its line of road, 14 Stat. 79, c. 159, provided that, upon the filing of a map, showing the general route of the road, the lands along the entire line thereof, so far as the same might be designated, should be reserved from sale by order of the Secretary of the Interior, showing clearly that it was designed to preserve the land grant to which the road was entitled under the original act.

In this condition of things the act of 1869 was passed, which authorized this corporation, then known as the Union Pacific, Eastern Division, to contract with the Denver Pacific, a Colorado corporation, for the construction of that portion of its line between Denver and Cheyenne, (hereby clearly recognizing the validity of the change of location,) to adopt its road-bed, to grant to the Denver Pacific a "perpetual use of its right of way and depot grounds, and to transfer to it

all the rights and privileges, subject to all the obligations appertaining to such part of its line." Even supposing that the act of 1866 did not, upon its face, authorize the change that was actually made, that is, westwardly to Cheyenne, by the way of Denver, it is clear that, by the act of March, 1869, this line was recognized as a proper compliance with the act of 1866, and as a valid and continuous line from Kansas City to Cheyenne.

The position of the government in this connection is that the act of 1869 separated the grant of lands to the Denver Pacific from that in aid of the Eastern Division of the Union Pacific, and thereby made them two distinct and independent lines of road, each with its own land grant. This construction would disentitle the Kansas Pacific Company to any lands west of its terminus at Denver, or west of a north and south line across its twenty-mile limit, and the Denver Pacific to any lands south of its terminus at the same place, leaving a triangular piece of about 200,000 acres to revert to the government. These are the lands in dispute.

We do not, however, so read the act. It did not declare that the Union Pacific, Eastern Division, should end at Denver or that the Denver Pacific should begin at Denver, but simply that the former might contract with the latter for the construction, operation and maintenance of a part of its line. Under the interpretation contended for, if that part had been between the one hundredth meridian and Denver, instead of between Denver and Cheyenne, it would thereby have made it a distinct and independent line of road, though running in the same direction.

It is true that, under the original act of 1862, the grant was limited to the odd-numbered sections " on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road," but it does not follow that if the road makes a curve or right angle, the grant ceases in any way to be operative at that point. The railroad is entitled to its grant of ten alternate sections to each mile of road, and is entitled to have it selected within the limits of twenty miles on each side ; but there is no requirement that

the lands shall be reached by a line run at right angles to the road.. Considerable light is thrown upon the interpretation of the statute of 1869 by the phraseology of section 2, which provides that the Union Pacific, Eastern Division, shall extend its line to Denver, "so as to form with that part of its line herein. authorized to be constructed" by. the Denver Pacific ":a *continuous line* of railroad and telegraph from Kansas City, by way of Denver, to Cheyenne," and that "all the provisions of law for the operation of the Union Pacific Railroad, its branches and connections, as a *continuous line*, without discrimination, shall apply the same as if the road from Denver to Cheyenne had been constructed by the Union Pacific Railway Company, Eastern Division." So far from this language indicating that this was not to be considered a single line, it is difficult to see how Congress could have expressed more clearly, by inference, that they were not to be treated as independent roads. This construction is also reinforced by the amendatory act of June 20, 1874, 18 Stat. 111, which provides that "for all the purposes of said act," (of 1862,) "and of the acts amendatory thereof, the railway of the Denver Pacific Railway and Telegraph Company shall be deemed and taken to be a part and extension of the road of the Kansas Pacific Railroad, to the point of junction thereof with the road of the Union Pacific Railroad Company at Cheyenne, as provided in the act of March third, 1869."

Indeed, it is difficult to avoid the conclusion that the act of 1862, being a grant *in præsenti*, the rights of the Union Pacific, Eastern Division, to the lands upon each side of its road became fixed from the moment it proceeded, under the act of 1866, to establish its line of definite location so as to make the same extend from Kansas City westwardly to Denver, and thence northwardly to Cheyenne; and, in fact, that was practically the ruling of this court in *Missouri, Kansas &c. Railway* v. *Kansas Pacific Railroad Company*, 97 U. S. 491, 496, 497, 498. But however this may be, it is entirely clear that the act of 1869 should not be construed to have the effect of breaking the continuity of the line unless its language impera-

tively requires it. So far from this being the case, the very title of the act, " to authorize the transfer of lands," granted to the Union Pacific, to the Denver Pacific, " and to expedite the completion of railroads to Denver," indicates that it was never intended to operate as a forfeiture, or as a reduction in amount, of any lands to which the Union Pacific, Eastern Division, had become entitled by filing its line of definite location, or to create distinct lines of road, but was merely designed to permit the Union Pacific to contract with the Denver Pacific for the construction, operation and maintenance of a portion of its line. It is true that by the 3d section, which authorizes the "said companies" to mortgage "their respective portions of said road," and provided that "each of said companies shall receive patents to the alternate sections of land along their respective lines," the two *corporations* were thereby recognized as independent, yet, at the same time, it recognized them as two corporations engaged in the construction of the same line of road, and evidently contemplated a division between them of the land grant appropriated to such line. The special proviso of section 3 was doubtless inserted to entitle the Denver Pacific to take patents for its portion of the land granted, direct from the United States.

In addition to all this, the facts set forth in the plea of Joseph Standley, which, for the purposes of this case, may be taken as true, indicate very strongly an acquiescence of the Interior Department from the date of the act of March 3, 1869, down to December, 1887, a period of over eighteen years, in the construction of the act contended for by the defendant. The plea set forth that, in compliance with the act of 1866, the Union Pacific, Eastern Division, filed with the Secretary of the Interior a map of the *general route* of its line, from the western boundary of Kansas, through Denver, to Cheyenne; and that the Secretary of the Interior on the same day directed the withdrawal of lands in Colorado on the designated line of said route; that, in pursuance of said direction, the Commissioner of the Land Office prepared a diagram showing the line of route, and the map of the land grant, and forwarded the same to the register and receiver of the land office at Denver,

directing the odd-numbered sections to be withdrawn on account of this grant; that, included in said diagram, are all the lands mentioned in the bill; that these lands were so withdrawn in accordance with these instructions; that this map of the general route was the only one ever filed; that the directions to withdraw these lands were never vacated; that on August 21, 1869, the Denver Pacific filed its map of definite location of the section between Denver and Cheyenne, which was approved by the Secretary of the Interior; that on May 26, 1870, the Kansas Pacific also filed its map of definite location between the boundary of Kansas and Denver, which was approved by the Secretary of the Interior; that, under his directions, the Commissioner of the General Land Office prepared maps showing the limits of the land grants; that, included in these maps, were all the lands described in the bill; and that in 1870, a contest having arisen between the two roads as to the ownership of certain sections, an adjustment was had by the Department of the Interior of their several rights.

The plea further avers that, in 1873, in a case then pending in the General Land Office between the Kansas City Pacific and one William Hodge and John Tracy, the Commissioner of the Land Office formally decided that the act of 1869 did not sever the original grant to the Union Pacific, but that the grant was a continuous one through Denver to Cheyenne; that his ruling in that particular was affirmed in 1874 by the acting Secretary of the Interior; and that this was the uniform construction put upon the act until 1887, when the Department reversed its former decision, and for the first time held that the lands covered by the bill were not included within the land grant to either road.

If there were any doubts with regard to the interpretation of the act of 1869, the construction placed upon it by the Land Department for eighteen years, under which construction these lands have been put upon the market and sold, would undoubtedly be entitled to considerable weight.

We have no doubt of the correctness of the conclusion reached by the court below, and its decree is, therefore,

*Affirmed.*