696 F.2d 88
 UNION PACIFIC LAND RESOURCES CORPORATION, a corporation,
Champlin Petroleum Company, a corporation, and
Amoco Production Company, a corporation,
Plaintiffs-Appellees,
v.
MOENCH INVESTMENT COMPANY, LTD., a limited partnership; and
Thousand Peaks Ranches, Inc., d/b/a Howells
Livestock, Inc., a corporation,
Defendants-Appellants.
 No. 80-1966.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 14, 1982.
 
 Floyd Abrams, of Cahill Gordon & Reindel, New York City (Robert Martin, Gary W. Davis, and Lee Thompson of Martin, Pringle, Fair, Davis & Oliver, Wichita, Kan., Edward W. Clyde of Clyde, Pratt, Gibbs & Cahoon, Salt Lake City, Utah and Richard Rideout of Vines, Rideout & Gusea, Cheyenne, Wyo., on brief), for defendants-appellants.
 Daniel M. Gribbon of Covington & Burling, Washington, D.C. (D. Thomas Kidd, Casper, Wyo., Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., Houston G. Williams of Williams, Porter, Day & Neville, P.C., Casper, Wyo., and Russell H. Carpenter, Jr., David F. Williams, and Stephen H. Galebach, of Covington & Burling, Washington, D.C., with him on brief), for plaintiffs-appellees.
 Before SETH, Chief Judge, SEYMOUR, Circuit Judge, and COOK,* District Judge.
 SEYMOUR, Circuit Judge.
 
 
 1
 This diversity action involves title to oil and gas interests in lands situated in western Wyoming. Union Pacific Land Resources Corporation (Union), Champlin Petroleum Company (Champlin), and Amoco Production Company (Amoco) brought this quiet title suit in the Wyoming District Court against Moench Investment Company (Moench) and Thousand Peaks Ranches, Inc. (Thousand Peaks), the holders of the surface estate to the lands in question. The district court granted summary judgment in favor of plaintiffs, and Moench and Thousand Peaks (hereinafter referred to collectively as Moench) appeal. Moench contends that summary judgment was inappropriate because facts crucial to the interpretation of documents determinative of the oil and gas ownership issue remain controverted. We disagree.
 
 I.
 HISTORICAL BACKGROUND
 
 2
 The lands involved in this case, five sections or part-sections of land located in Uinta County, Wyoming, were originally granted to a corporate predecessor of the Union Pacific Railroad Company pursuant to the Union Pacific Act of 1862, ch. 120, 12 Stat. 489, amended by Act of July 2, 1864, ch. 216, 13 Stat. 356. Section 3 of the Act granted odd-numbered sections of public land to the Railroad for every mile of track laid "for the purpose of aiding in the construction" of a transcontinental railway.[1] The Union Pacific Act of 1862, ch. 120, Sec. 3, 12 Stat. 489, 492, amended by Act of July 2, 1864, ch. 216, Sec. 4, 13 Stat. 356, 358. The grant excluded "all mineral lands" from the conveyance. Union Pacific Act Sec. 3. Section 4 of the Act provided that patents to the lands conveyed by section 3 would be issued to the Railroad upon completion of forty consecutive miles of railway. Id. Sec. 4.
 
 
 3
 The lands here at issue were originally granted to "The Union Pacific Railroad Company" (The Union Pacific) by the Union Pacific Act. In the years immediately following the Act's passage and amendment, The Union Pacific was unable to raise adequate financing for construction of the railway. Therefore, in 1867 the company mortgaged its entire land grant including the lands in controversy. A second mortgage of the entire grant was executed in 1873. In 1880, The Union Pacific was consolidated with two other land-grant railroad corporations to form "The Union Pacific Railway Company" (the Railway), which succeeded to The Union Pacific's interests. See United States v. Union Pacific Railway, 148 U.S. 562, 566-67, 13 S.Ct. 724, 725-26, 37 L.Ed. 560 (1893). In 1893, the Railway went into receivership. The mortgage was foreclosed in 1898, Final Decree of Foreclosure, Union Trust Co. v. The Union Pacific Railway (No. 252, D.Utah 1898) (cited in Rec., vol. I, at 324), and the land-grant lands and interests therein still owned by the Railway were sold to the "Union Pacific Railroad Company (the Railroad) in 1899, Rec., vol. VII, Ex. 1-C (Special Master's deed). The Railroad obtained patents to these lands in 1901. The Railroad later sold the real estate to the Rigby Ranch Company retaining "all coal and other minerals" for itself, its successors, and its assigns. Moench acquired the Rigby Ranch Company interests between 1936 and 1939, and Union obtained the Railroad interests in 1971. In 1977, Union conveyed its petroleum rights in the lands to Champlin, which subsequently leased the same to Amoco.
 
 II.
 PROCEDURAL HISTORY
 
 4
 Union, Champlin, and Amoco (hereinafter referred to collectively as Union) brought an action to quiet title to the petroleum rights in these Wyoming lands in June 1979. The lawsuit was apparently a reaction to litigation previously commenced by Moench and others contesting Union's title to oil and gas under identical mineral reservations in deeds to other land grant property in Utah and Wyoming.
 
 
 5
 Moench responded to the quiet title action by: (1) denying that Union owned any minerals in the Wyoming real estate; (2) contending that the Union Pacific Act required the original grantee and its successors to sell or forfeit all interests in the land grant acreage; and (3) claiming that the Railroad's retention of "all coal and other minerals" was ambiguous and should be interpreted to exclude oil and gas.
 
 
 6
 The district court entered summary judgment for Union in August 1980. Union Pacific Land Resources Corp. v. Moench Investment Co., 495 F.Supp. 876 (D.Wyo.1980). The court recited the previously outlined chains of title, determined that the mineral reservation included oil and gas rights as a matter of state law, and rejected Moench's Union Pacific Act claims. Id. at 877-78.
 
 
 7
 Moench now contests on two independent bases the propriety of entering summary judgment. It primarily asserts that facts prerequisite to a correct construction of Pacific Railroad Act land grant conditions remain in dispute. Moench suggests this alleged factual controversy precludes any summary determination as to the extent of Union's oil and gas ownership in the Wyoming properties. Moench additionally charges that the Railroad's deed reservation of "all coal and other minerals" is ambiguous and argues that parol evidence establishes that the clause excludes petroleum products.
 
 III.
 ANALYSIS
 A. Pacific Railroad Act Issue
 
 8
 Moench's first argument focuses on the Act's "settlement and preemption" proviso. Congress granted the section 3 lands to The Union Pacific to enable it to finance its construction costs by land sales. However, Congress did not wish the lands to be entirely foreclosed to settlers in the country's nineteenth century westward expansion. Thus, Congress provided that
 
 
 9
 "[A]ll such lands, so granted by this section, which shall not be sold or disposed of by said company within three years after the entire [transcontinental railway] shall have been completed, shall be subject to settlement and preemption, like other lands ...."
 
 
 10
 Union Pacific Act Sec. 3.
 
 
 11
 Moench maintains that factual disputes exist concerning the meaning of this condition and the compliance or noncompliance with its requirements, which render summary judgment improper. Moench claims that the facts surrounding the insertion of the proviso into the Union Pacific Act suggest a governmental intention to prevent The Union Pacific (and thus its successors in interest) from obtaining any surface or mineral interest in the granted lands beyond that immediately necessary for the construction of the railway. Moench additionally argues that the Wyoming property was never "sold or disposed of" as required by the settlement and preemption proviso, and that public policy therefore demands that the Railroad's successor, Union, now divest itself of all interest in the real estate.
 
 
 12
 Moench's theory essentially must be that the terms of section 3 precluded the Railroad from retaining an interest in the mineral estate while selling the surface estate to Moench's predecessor in interest. The section does state that "all mineral lands" are excepted from the Act's land grants. See United States v. Union Pacific Railroad, 353 U.S. 112, 114-17, 77 S.Ct. 685, 686-87, 1 L.Ed.2d 693 (1957). However, the Supreme Court has held repeatedly that this exception refers to the determination at time of patenting of the lands' mineral or non-mineral character. See, e.g., id. at 116, 77 S.Ct. at 687; Burke v. Southern Pacific Railroad, 234 U.S. 669, 683-85, 698-705, 34 S.Ct. 907, 912-13, 918-921, 58 L.Ed. 1527 (1914); Shaw v. Kellogg, 170 U.S. 312, 339, 18 S.Ct. 632, 643, 42 L.Ed. 1050 (1898); Davis v. Wiebbold, 139 U.S. 507, 519, 11 S.Ct. 628, 632, 35 L.Ed. 238 (1891). The issuance of a patent after an administrative determination that the lands were not mineral in character was held to constitute a final administrative decision that is conclusive on the issue against collateral attack. Burke, 234 U.S. at 691-92, 710, 34 S.Ct. at 916, 923; see also Davis v. Wiebbold, 139 U.S. at 526-27, 529-30, 11 S.Ct. at 635-636 (Land Department patents conclusive when assailed collaterally); Deffeback v. Hawkes, 115 U.S. 392, 404-05, 6 S.Ct. 95, 100-01, 29 L.Ed. 423 (1885) (lands for which a patent has been issued under a grant excepting mineral lands are proof against a later discovery of minerals).[2] The lands at issue were patented to the Railroad in 1901. The mineral lands exclusion therefore does not restrain grantees' ability to reserve mineral interests in sales of section three lands.
 
 
 13
 Neither do we find Moench's "settlement and preemption" clause argument persuasive. The language of the clause in no way suggests that the grantee received only a limited fee barren of rights to whatever minerals might later be discovered. Nor does the language suggest that the grantee was required to convey its entire fee to a purchaser. Moench points to no legislative history that supports its interpretation of the clause. At most the clause requires the grantee to stand in the government's shoes with respect to settlers seeking preemptive rights to lands neither sold nor disposed of within three years of completion of the railway. In such a situation, a settler seeking land under section 3 might well be entitled to the entire fee. However, we need not address this question, for in this case the lands at issue were "sold or disposed of ... within three years" of the railway's completion.
 
 
 14
 In 1879, the Supreme Court examined the effect of the land-grant mortgages relative to section 3's "sale or disposal" clause. In Platt v. Union Pacific Railroad, 99 U.S. 48, 25 L.Ed. 424 (1879), would-be preemptors challenged the mortgage transactions as not being sales or disposals as required by section 3. The Court dismissed the claim that this financing maneuver was violative of congressional intent that the company not acquire a monopolistic holding of the public lands, id. at 64-65, stating that "we have been led unhesitatingly to the conclusion that the deed of trust or mortgage executed ... in 1867 was a disposition of the lands granted by the 3d section of the Act of 1862, within the meaning of that Act," id. at 64.[3]
 
 
 15
 In Platt, the Court specifically declined to consider "whether the lands covered by the mortgage will not be open for preemption, if they shall remain unsold after the mortgage shall be extinguished." Id. We too need not consider the question, because the lands were in fact sold upon foreclosure of the mortgages. The lands were not then and are not now subject to the settlement and preemption clause.[4]
 
 
 16
 The Union Pacific received an unqualified fee interest in the lands involved in this case and subsequently "sold or disposed of" them as required by the statute. We hold that the Railroad's sale of the surface estate to the Rigby Ranch Company, reserving "coal and other minerals" to the Railroad, did not violate the Union Pacific Act.[5]
 
 B. Deed Reservation Claims
 
 17
 Moench erroneously argues that summary judgment is improper because of factual disputes over the scope of the Railroad's reservation of "coal and other minerals" in its conveyances to Moench's predecessor. Wyoming substantive law governs this diversity case. Although no Wyoming state court has passed upon the issue, a Wyoming federal district court has previously determined that the phrase "coal and other minerals" unambiguously encompasses oil and gas as a matter of Wyoming law. Amoco Production Co. v. Guild Trust, 461 F.Supp. 279, 283 (D.Wyo.1978). We affirmed that holding in Amoco Production Co. v. Guild Trust, 636 F.2d 261 (10th Cir.1980), cert. denied, 452 U.S. 967, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). Because the phrase is unambiguous, there is no need to resort to the supplementary materials that Moench contends are necessary to determine the plain meaning of the reservation. See Shepard v. Top Hat Land & Cattle Co., 560 P.2d 730, 732 (Wyo.1977).
 
 
 18
 Moench also makes numerous allegations of deceptive and inconsistent practices on the part of the Railroad in its sales of section 3 lands. However, Moench does not allege that its predecessor, the Rigby Ranch, was in fact defrauded or misled in any way in its purchase of the lands at issue. Consequently, although Moench's contentions make interesting reading, they provide no basis for remanding for further consideration in examining the transaction at issue.
 
 
 19
 We have reviewed Moench's remaining arguments and find them unpersuasive.
 
 
 20
 AFFIRMED.
 
 
 
 *
 Honorable H. Dale Cook, Chief District Judge for the Northern District of Oklahoma, sitting by designation
 
 
 [1]
 Section 3 provides:
 "And be it further enacted, That there be, and is hereby, granted to the said company, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a preemption or homestead claim may not have attached, at the time the line of said road is definitely fixed; Provided, That all mineral lands shall be excepted from the operation of this act; but where the same shall contain timber, the timber thereon is hereby granted to said company. And all such lands, so granted by this section, which shall not be sold or disposed of by said company within three years after the entire road shall have been completed, shall be subject to settlement and preemption, like other lands, at a price not exceeding one dollar and twenty-five cents per acre, to be paid to said company."
 Union Pacific Act of 1862, ch. 120, Sec. 3, 12 Stat. 489, 492, amended by Act of July 2, 1864, ch. 216, Sec. 4, 13 Stat. 356, 358.
 
 
 [2]
 The patents to the lands at issue here contain the phrase "the United States ... Do Give and Grant unto the said 'Union Pacific Railroad Company' and to its assigns the tracts of land listed [in the patent]: Yet excluding and excepting from the transfer by these presents 'All Mineral Lands' should any such be found to exist in the tracts." Rec., vol. VII, Exhibits I-A, -B. In Burke v. Southern Pac. R.R., 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527 (1914), the Supreme Court held that this clause, contained in all patents issued from 1866 to 1904 under railroad land grants containing mineral lands exclusions, was invalid. Id. at 693-95, 705, 710-11, 34 S.Ct. at 916-17, 921, 923-24
 
 
 [3]
 Moench argues that we should discount Platt 's holding because it was a "collusive" lawsuit, brought by one of the Union Pacific's own attorneys, William H. Platt, and completely funded by the railroad. Brief of Appellant, at 10. Although this contention is intriguing, we note that the case was argued before the Court by the Attorney General of the United States as intervenor in opposition to The Union Pacific, see Platt v. The Union Pac. R.R., 99 U.S. 48, 48 (1879) (reporter's syllabus). Additionally, the Court fully considered and discussed the "sale or disposal" issue. Because Platt has never been overturned, it remains determinative on this point
 
 
 [4]
 This quiet title suit resolves only the relative rights of the parties involved. From the record before us, it appears evident that if any doubt remains about the nature of the interest granted to The Union Pacific, the only party who could raise that question would be the original grantor, the United States. Burke v. Southern Pac. R.R., 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527 (1914), a case brought by a person claiming mineral rights in lands patented to the railroad, held that the government's issuance of a patent vested title to petroleum deposits located in the lands conveyed. Id. at 710-11, 34 S.Ct. at 923-24. The railroad's title was subject to the government's right to attack the patent by a direct suit for annulment if the land was known to be mineral when the patent was issued. Id. The government does not appear in this case
 Likewise, the only other cloud on appellees' interests here, the mineral lands exception contained in the original federal patents, see note 2 supra, would lie in favor of the government. The government does not appear to contest the Supreme Court's holding in Burke, 234 U.S. at 710, 34 S.Ct. at 923, that such exception is void and of no effect.
 
 
 [5]
 We also reject Moench's argument that a factual dispute involving the meaning of or adherence to the "sale or disposal" condition precludes summary judgment in this case. Questions of statutory construction and legislative history traditionally present legal questions properly resolved by summary judgment. Standard Oil v. Department of Energy, 596 F.2d 1029, 1066 (Temp.Em.Ct. of App.1978); Mobil Oil Corp. v. Federal Energy Admin., 566 F.2d 87, 92 (Temp.Em.Ct. of App.1977)