820 F.2d 338
 ANSCHUTZ LAND AND LIVESTOCK COMPANY, INC., a corporation,
Plaintiff-Appellant,
v.
UNION PACIFIC RAILROAD COMPANY, a corporation, et al.,
Defendants-Appellees.
MOENCH INVESTMENT COMPANY, LTD., a Utah limited partnership,
Plaintiff- Appellant,
v.
UNION PACIFIC RAILROAD COMPANY, a corporation, et al.,
Defendants-Appellees.
ANTELOPE ISLAND CATTLE COMPANY, INC., a corporation,
Plaintiff-Appellant,
v.
UNION PACIFIC CORPORATION, et al., Defendants-Appellees.
ANTELOPE ISLAND CATTLE COMPANY, INC., a corporation, Plaintiff,
v.
UNION PACIFIC RAILROAD COMPANY, a corporation, et al.,
Defendants-Appellees,
Joseph O. Fawcett & Sons, Inc., a Utah corporation, et al.,
Plaintiffs in Intervention/Appellants.
ANSCHUTZ LAND AND LIVESTOCK COMPANY, INC., a corporation, Plaintiff,
v.
UNION PACIFIC RAILROAD COMPANY, a Corporation, et al.,
Defendants-Appellees,
Joseph O. Fawcett & Sons, Inc., et al., a Utah corporation,
Plaintiffs in Intervention/Appellants.
CHAMPLIN PETROLEUM COMPANY, a corporation, et al.,
Plaintiffs-Appellees,
v.
HOWELLS LIVESTOCK, INC., a corporation, Defendant-Appellant.
 Nos. 84-2195, 84-2198, 84-2199, 84-2227, 84-2228 and 84-2445.
 United States Court of Appeals,
Tenth Circuit.
 June 2, 1987.
Rehearing Denied in No. 84-2195 July 1, 1987.
 
 Floyd Abrams of Cahill Gordon & Reindel, New York City (Robert Martin and Lee Thompson of Martin, Pringle, Oliver, Triplett & Wallace, Wichita, Kan., Edward Clyde and Rodney Snow of Clyde, Pratt, Gibbs & Cahoon, Salt Lake City, Utah, and Leonard A. Spivak, Dean Ringel and John Sander of Cahill Gordon & Reindel, New York City, with him on the briefs), for appellants Anschutz Land and Livestock Co., Inc., Antelope Island Cattle Co., Moench Inv. Co., Ltd., and Howells Livestock, Inc.
 Stewart M. Hanson, Jr. of Suitter Axland Armstrong & Hanson, Salt Lake City, Utah (David R. Olsen and Michael W. Homer of Suitter Axland Armstrong & Hanson, and William J. Cayias of Cayias, Livingston & Smith, Salt Lake City, Utah, with him on the briefs), for plaintiffs in intervention/appellants.
 Daniel M. Gribbon of Covington & Burling, Washington, D.C., for defendants-appellees.
 Leonard J. Lewis and Alan L. Sullivan of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, and Russell H. Carpenter, Jr., and Laird Hart of Covington & Burling, Washington, D.C., with him on the brief, for defendant-appellee Union Pacific Land Resources Corp. and plaintiff-appellee Champlin Petroleum Co.
 Charles T. Krol and Rebecca S. McGee, Amoco Production Co., Denver, Colo., Ewing Werlein, Jr., and Page I. Austin of Vinson & Elkins, Houston, Tex., and Stephen H. Anderson and Kent H. Murdock of Ray, Quinney & Nebeker, Salt Lake City, Utah, on the brief, for defendant-appellee Amoco Production Co.
 Before McKAY and TACHA, Circuit Judges, and BROWN*, District Judge.
 McKAY, Circuit Judge.
 
 
 1
 Four related actions were filed in the United States District Court for the District of Utah to quiet title to the mineral estates of certain lands in Utah and Wyoming.[1] When plaintiffs' predecessors-in-interest originally bought the lands from the Union Pacific Railroad (or its predecessor) in the late nineteenth and early twentieth centuries, the Railroad executed deeds using one of three clauses purporting to retain all subsurface mineral interests in the Railroad.[2] The first of these reservations reads as follows:
 
 
 2
 Excepting and Reserving to said Union Pacific Railroad Company, its successors and assigns:
 
 
 3
 FIRST: All coal and other minerals within or underlying said land.
 
 
 4
 SECOND: The exclusive right to prospect in and upon said land for coal and other minerals therein, or which may be supposed to be therein, and to mine for and remove, from said land, all coal and other minerals which may be found thereon by anyone.
 
 
 5
 THIRD: The right of ingress, egress and regress upon said land to prospect for, mine and remove any and all such coal or other minerals, and the right to use so much of said land as may be convenient or necessary for the right-of-way to and from such prospect places, or mines, and for the convenient and proper operation of such prospect places, mines, and for roads and approaches thereto or for removal therefrom of coal, mineral, machinery, or other material.
 
 
 6
 [hereinafter Reservation A]. The second form of reservation reads as follows:
 
 
 7
 Excepting and Reserving to said Union Pacific Railroad Company, its successors and assigns:
 
 
 8
 FIRST: All oil, coal and other minerals within or underlying said lands.
 
 
 9
 SECOND: The exclusive right to prospect in and upon said land for oil, coal and other minerals therein, or which may be supposed to be therein, and to mine for and remove, from said land, all oil, coal and other minerals which may be found thereon by any one.
 
 
 10
 THIRD: The right of ingress, egress and regress upon said land to prospect for, mine and remove any and all such oil, coal or other minerals, and the right to use so much of said land as may be convenient or necessary for the right-of-way to and from such prospect places or mines, and for the convenient and proper operation of such prospect places, mines, and for roads and approaches thereto or for removal therefrom of oil, coal, mineral, machinery, or other material.
 
 
 11
 [hereinafter Reservation B]. The third form of reservation reads as follows:
 
 
 12
 Reserving, however to the said Union Pacific Railway Company the exclusive right to prospect for coal and other minerals within and underlying said lands and to mine for and remove the same if found and for this purpose it shall have right of way over and across said lands, and space necessary for the conduct of said business thereon without charge or liability for damage therefor.
 
 
 13
 [hereinafter Reservation C].
 
 
 14
 The plaintiffs claimed that: (1) the Pacific Railroad Act of 1862, ch. 120, 12 Stat. 489, amended by Act of July 2, 1864, ch. 216, 13 Stat. 356, prohibited the Railroad's reservation of the subsurface; (2) the Railroad never intended to reserve any interest in oil, gas, and other associated hydrocarbons when it used the words "other minerals" in Reservations A and C; (3) the Railroad never intended to reserve any interest in natural gas when it used the words "other minerals" in Reservation B; and (4) Reservation C was insufficient as a matter of law to reserve to the Railroad a fee interest in any minerals. The plaintiffs sought to introduce evidence extrinsic to the deeds themselves that allegedly illuminate the Railroad's intent contemporaneous with the execution of the deeds.
 
 
 15
 The Railroad moved for summary judgment, arguing that, as a matter of law, the various clauses used in the deeds encompassed oil and gas interests, were sufficient to reserve a fee interest in the Railroad, and comported with the Pacific Railroad Act. After examining extensive memoranda and hearing lengthy oral arguments on three separate occasions, the trial court entered a memorandum opinion and order, granting the Railroad's summary judgment motion and dismissing the various claims with prejudice. Plaintiffs appeal.
 
 I.
 
 16
 Plaintiffs contend that the "settlement and preemption" proviso of the Pacific Railroad Act of 1862 rendered invalid all attempts to retain the subsurface of land grant lands.[3] We rejected this precise contention in Union Pacific Land Resources Corp. v. Moench Investment Co., 696 F.2d 88, 91-93 (10th Cir.1982), cert. denied, 460 U.S. 1085, 103 S.Ct. 1776, 76 L.Ed.2d 348 (1983). In addition to simply arguing that Moench was wrongly decided on this issue, plaintiffs attempt to distinguish it by stressing that the deeds in that case were all issued after the 1899 mortgage foreclosure sale to the Railroad of all the lands owned by the Railroad's corporate predecessor.[4] According to plaintiffs, Moench held only that because the entire fee interests were transferred through the foreclosure sale, the settlement and preemption proviso was satisfied before the later sales of the land that were at issue in that case. Some of the disputed deeds in the present case were issued before the 1899 foreclosure sale to the Railroad, and plaintiffs argue that Moench is not controlling as to those.
 
 
 17
 We disagree with plaintiffs for three reasons. First, we did not rest our decision in Moench solely on the factual finding that the lands in issue were deeded after the foreclosure sale, although we did discuss that argument as further support for our holding. We squarely addressed the legal argument that the proviso "precluded the Railroad from retaining an interest in the mineral estate while selling the surface estate...." Id. at 91. We stated that "the language [does not] suggest that the [Railroad] was required to convey its entire fee to a purchaser." Id. at 92.
 
 
 18
 Second, plaintiffs' argument necessarily assumes that the proviso allowed the Railroad to retain the subsurface of lands it received in the foreclosure sale and thereafter sold, while that same proviso prohibited the Railroad's predecessor from doing likewise. No reading of the statute supports such an arbitrary distinction. The statutory language either allows reservation of the subsurface or it requires sale of the full fee, whenever the land was sold. We reiterate that "the language [does not] suggest that the [Railroad] was required to convey its entire fee to a purchaser." Id.
 
 
 19
 Finally, plaintiffs' factual premise fails. While some of the disputed deeds in this case were issued prior to the 1899 foreclosure sale, none was issued before the 1867 mortgage. The Supreme Court case on which we relied in Moench held that the 1867 mortgage was a "disposition" of the mortgaged lands within the meaning of the settlement and preemption proviso. See Platt v. Union Pac. R.R., 99 U.S. 48, 25 L.Ed. 424 (1879). Plaintiffs' focus on the year 1899 is therefore misplaced.
 
 II.
 
 20
 State substantive law controls the resolution of real property claims. See Williams v. North Carolina, 317 U.S. 287, 294 n. 5, 63 S.Ct. 207, 211 n. 5, 87 L.Ed. 279 (1942) ("state where the land is located is 'sole mistress' of its rules of real property"). Plaintiffs' claims regarding the Wyoming lands must fail. This court has on three prior occasions reviewed the same language in deeds issued from the same defendant, the Union Pacific, under Wyoming law. A unanimous panel in each held that the deed reservations validly reserved all minerals, including oil and gas, as a matter of law. See Moench Inv. Co., 696 F.2d at 93; Guild Trust v. Union Pac. Land Resources Corp., 682 F.2d 208, 209-12 (10th Cir.1982); Amoco Prod. Co. v. Guild Trust, 636 F.2d 261, 264 (10th Cir.1980), cert. denied, 452 U.S. 967, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). The Wyoming Supreme Court has not since ruled otherwise. We deny the plaintiffs' motion on appeal to certify these settled questions to that Court for reconsideration. Thus, the only issue remaining on appeal is whether Utah law requires the same result with respect to the Utah lands.
 
 III.
 
 21
 Both the plaintiffs and the Railroad agree that Western Development Co. v. Nell, 4 Utah 2d 112, 288 P.2d 452 (1955), controls whether evidence of intent extrinsic to the deeds was properly ruled inadmissible in this case and whether the deeds were sufficient as a matter of law to reserve all oil and gas interests in the Railroad. The Utah district court judge stated that "if the Utah Supreme Court were presented with the precise issue before this court, it would hold as a matter of law that the term 'other minerals' in Reservation A includes oil and gas." Memorandum Opinion at 12. It ruled similarly as to Reservations B and C. See id. at 12-13. Under the current rule in this circuit, we may not overturn the local district judge's interpretation of Utah law unless it is clearly erroneous. See Hauser v. Public Serv. Co., 797 F.2d 876, 878 (10th Cir.1986) (in reviewing interpretation and application of state law by resident federal district judge in a diversity action, court of appeals is governed by clearly erroneous standard).
 
 
 22
 However, we need not resort to that rule in this case. We cannot improve upon the district court's persuasive reasoning and adopt it as dispositive. Chief Judge Jenkins held:
 
 
 23
 In Nell the Utah court considered a reservation and a granting clause. The reservation reads: "Reserving unto the said grantor, its successors and assigns all the coal, gold, silver, lead, copper and other precious and valuable ores, minerals, mines and mining rights." [288 P.2d] at 453. The grant reads in pertinent part: "[T]he Parties ... do grant, bargain, sell and convey ... unto the said party of the second part, its successors and assigns, all the coal, gold, silver, lead, copper and other precious and valuable ores, minerals, mines and mining rights...." Id. The Utah court stated that if it were required to construe those paragraphs alone, it would "have no hesitation in endorsing and applying the majority rule that a reservation of 'minerals' retains the rights to gas and oil unless a contrary intention is manifested." Id. at 454. The court, however, held that other language in the reservation and grant created an ambiguity in the term "minerals". The court stated that in addition to the specific enumeration of hard rock minerals, the deed granted easements and other rights appropriate to mining hard rock minerals, such as the right to build "coal mine appurtenances". The language, however, did not include "grants ... appropriate to the development of oil upon the land". The language referring to the mining of hard rock minerals and the absence of language referring to the mining of oil and gas created a sufficient ambiguity to justify the admission of extrinsic evidence of intent. Id.
 
 
 24
 Plaintiffs' argue that ambiguities similar to the ambiguities in Nell exist here. In the opinion of this court, the language in paragraphs two and three of Reservation A is clear and without ambiguity. The language in Nell is much more restrictive than the language in Reservation A. The first clause of the reservation in Nell enumerated five specific hard rock minerals, including other "ores" and referred to "mines and mining rights." That clause also refers to "minerals", which taken alone may include oil and gas. But, when read in context with the enumerated hard rock minerals and the clauses reserving the right to build "coal mine appurtenances," the Nell reservation contains no language broad enough to allow for oil and gas extraction.
 
 
 25
 The language in Reservation A is far broader.... [Its] language grants the surface use of the land for the "removal" of all minerals. The term "removal" is broad enough to include extraction of oil and gas by the drilling of a well.
 
 
 26
 The reservation's use of "prospect places" and "to prospect for" is similarly broad enough to include oil and gas wells, as well as hard rock mines. Prospect as a noun is defined as "[t]he location or probable location of a mineral deposit." The American Heritage Dictionary 995 (2d ed. 1982). As a verb, prospect is defined as "To search for or explore" for minerals. Id. A prospector is "[o]ne who explores an area for natural deposits such as gold or oil." Id. See also Crighton v. State, 128 S.W.2d 823 (Tex.Civ.App.1939) (the term prospect was used in reference to petroleum and natural gas). Limiting "prospect" exclusively to hard rock mines would be too restrictive.
 
 
 27
 Furthermore, the punctuation used and use of the disjunctive term "or" also indicates that "prospect places" was not limited to hard rock "mines" but was far broader. Indeed, if the parties had intended hard rock mines only, the use of "prospect places" in addition to the use of "mines" would have been superfluous.
 
 
 28
 This court holds that the language in Reservation A is plain, clear and without ambiguity. The term "other minerals" includes oil and gas....
 
 
 29
 Plaintiffs' argument is less persuasive concerning Reservation B. Reservation B reserves to defendants all "oil, coal and other minerals". This is plain and without ambiguity. Paragraphs two and three of Reservation B are identical to those in Reservation A. When read in conjunction with the express reservation, those paragraphs contemplate the extraction of oil and the access to accomplish the extraction. ... The term "other minerals" includes gas as a matter of law....
 
 
 30
 The language in Reservation C is substantially the same as the language in Reservations A and B.
 
 
 31
 Memorandum Opinion at 9-13.
 
 
 32
 Like the district court, we thus hold that the various clauses used in Reservations A, B, and C were sufficient to encompass oil and gas interests as a matter of law. Extrinsic evidence of intent was properly held inadmissible.
 
 
 33
 We also reject plaintiffs' alternative arguments with respect to Reservation C alone. They first contend that the subsurface of lands conveyed with deeds using Reservation C was never included in the 1899 foreclosure sale, and thus the Railroad never acquired valid title to the mineral estates. Even if plaintiffs are correct, we fail to see why title to the mineral estates of such lands should now be quieted in them if the Railroad never had valid title to transfer to plaintiffs' predecessors. More to the point, however, is the district court's reasoning:
 
 
 34
 In paragraph 55 of his report, the Special Master specifically states that the coal and other mineral interests held by the Railroad were subject to the Sinking Fund Mortgage. Abrams' Affidavit, Exhibit 17 at 30-31. The Special Master further states in his conclusion to his Report:
 
 
 35
 the Sinking Fund Mortgage ... constitutes in legal effect ... a paramount and superior mortgage and lien upon all and singular lands granted to said The Union Pacific Railroad Company under Acts of Congress ... and also upon all the estate, rights, title, interests, claims, demands and reservation of coal, mining, minerals or other rights at law or equity....
 
 
 36
 Abrams' Affidavit, Exhibit 17 at 33.
 
 
 37
 Paragraph one of the Final Degree entered by the court states:
 
 
 38
 Ordered, adjudged and decreed as follows--that is to say:
 
 
 39
 That the Report of Howard S. Abbott, Special Master, to whom this cause was referred by order herein dated June 20th, 1898, which said report was filed in said cause on the 22nd day of November, 1898, be, and the same is hereby, in all respects approved and confirmed.
 
 
 40
 Abrams' Affidavit, Exhibit 18 at 2 (emphasis added).
 
 
 41
 The Final Decree further states in paragraph 20 that the purchaser at the foreclosure sale would receive "absolute title and right" to all the properties held by the Railroad, subject to the Sinking Fund Mortgage "whether said lands and rights are particularly described in this decree or the Master's said report and the schedules attached thereto or not." Abrams' Affidavit, Exhibit 18 at 25-26.
 
 
 42
 The record furnished to this court does not contain any metes and bounds description from which this court can determine with any degree of exactness whether the properties plaintiffs refer to were included in the foreclosure or not. Nor have plaintiffs called any such metes and bounds description to the court's attention. Absent more, all, it seems to this court, means all.
 
 
 43
 Memorandum Opinion at 20 n. 5.
 
 
 44
 Plaintiffs make the additional argument that Reservation C created only a license to mine minerals, revocable at the plaintiffs' will, and that it was insufficient to reserve to the Railroad a fee interest in the minerals themselves. The Colorado Supreme Court, in construing the identical language in a Union Pacific deed under Colorado law, agreed with plaintiffs' position. See Radke v. Union Pac. R.R. Co., 138 Colo. 189, 211, 334 P.2d 1077, 1088-89 (1959) (en banc). The majority rule to which most states subscribe is, however, to the contrary. That rule is: "Under property law, a reservation of an exclusive and unrestricted mining right is in effect a severance of the mineral estate from the surface estate which creates a fee simple estate in the minerals in place." Guild Trust v. Union Pac. Land Resources Corp., 475 F.Supp. 726, 727 (D.Wyo.1979), aff'd, 682 F.2d 208 (10th Cir.1982) (numerous treatise and case citations omitted).
 
 
 45
 After discussing pertinent Utah cases, the district court predicted that the Utah Supreme Court would follow the majority rule and decline to adopt Radke. See Memorandum Opinion at 16-17. We agree with the district court's holding. We thus hold that Reservation C was sufficient to reserve in the Railroad fee simple title to the mineral estate.[5]
 
 
 46
 AFFIRMED.
 
 
 
 *
 Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 The four plaintiffs in these actions were Anschutz Land and Livestock Company, Antelope Company, Moench Investment Company, Ltd., and Champlin Petroleum Company. Joseph O. Fawcett & Sons, Inc., thereafter intervened as plaintiffs in the Antelope Company action. The defendants below were the Union Pacific Railroad Company, Champlin Petroleum Company, Howells Livestock, Inc., and Amoco Production Company
 Although the cases were not consolidated, the resolution of the common legal issues in a single memorandum opinion disposed of all four cases. In the interest of brevity, "plaintiffs" will be hereafter used in referring to all four plaintiffs as well as the plaintiff in intervention. "Union Pacific" or "Railroad" will be used in referring to all four defendants.
 
 
 [2]
 The lands were usually sold for $1 per acre for grazing or agricultural purposes, a price the Railroad asserts was inadequate to justify including any mineral rights in the sale. See Answering Brief of Union Pacific Appellees at 3 n. 6, 4
 
 
 [3]
 That proviso states:
 [A]ll such lands, so granted by this section, which shall not be sold or disposed of by said company within three years after the entire road shall have been completed, shall be subject to settlement and preemption, like other lands, at a price not exceeding one dollar and twenty-five cents per acre, to be paid to said company.
 Pacific Railroad Act of 1862, ch. 120, Sec. 3, 12 Stat. 489, 492, amended by Act of July 2, 1864, ch. 216, Sec. 4, 13 Stat. 356, 358. Plaintiffs contend that "Congress did not [thereby] create a third option of selling the surface and retaining the subsurface." Brief of Appellants Anschutz Land and Livestock Co., Inc. at 46.
 
 
 [4]
 For a concise discussion of the historical background surrounding the land grants to the Railroad's corporate predecessor, the mortgage of the granted lands, and the subsequent sale of such lands to the Railroad, see Moench Investment Co., 696 F.2d at 89-90
 
 
 [5]
 One plaintiff, Joseph O. Fawcett & Sons, advances a new legal theory on appeal. It argues that if Reservation C is not construed as creating a mere revocable license, neither should it be construed as reserving to the Railroad full fee title. Rather, it urges us to consider the possibility that the deed reserved only an easement in the Railroad
 "We have often said that new theories and issues not presented to the trial court, in the absence of extraordinary circumstances, which are not present here, will not be considered on appeal." Hanley v. Chrysler Motors Corp., 433 F.2d 708, 711 (10th Cir.1970); see also United States v. Immordino, 534 F.2d 1378, 1381 (10th Cir.1976); Harmon v. Diversified Medical Inv. Corp., 524 F.2d 361, 365 (10th Cir.1975), cert. denied 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). This rule is particularly apt when dealing with a summary judgment, because the material facts are not in dispute and the trial judge considers only opposing legal theories.
 Propounding new arguments on appeal in attempting to prompt us to reverse the trial court--arguments never considered by the trial court--is not only somewhat devious, it undermines important judicial values. The rule disciplines and preserves the respective functions of the trial and appellate courts. If the rule were otherwise, we would be usurping the role of the first-level trial court with respect to the newly raised issue rather than reviewing the trial court's actions. By thus obliterating any application of a standard of review, which may be more stringent than a de novo consideration of the issue, the parties could affect their chances of victory merely by calculating at which level to better pursue their theory. Moreover, the opposing party would be effectively denied appellate review of the newly addressed issue, save in the rare instances of Supreme Court review. In order to preserve the integrity of the appellate structure, we should not be considered a "second-shot" forum, a forum where secondary, back-up theories may be mounted for the first time. Parties must be encouraged to "give it everything they've got" at the trial level.